CITY OF CORINTH *et al. v.* ROBERTSON, STATE REVENUE
AGENT, TO USE OF ALCORN COUNTY CHICKASAW
SCHOOL FUND.

[87 South. 464, No. 21383.]

1. PUBLIC LANDS.   *State held to have acquired school sections only
    upon survey and extinguishment of Indian rights,*
    The state of Mississippi acquired the right to the sections No. 16
    granted to it for the use of schools by the Act of Congress of
    March 3, 1803, when, but not until, the right of occupancy of the
    Indian tribes was extinguished and the sections had been sur-
    veyed as provided by law.

2. PUBLIC LANDS.   *Federal act held controlling as to terms of trust
    of school lands in Chickasaw Cession.*
    The terms of the trust upon which the land was granted to the
    state by the federal government for the use of schools in the

Chickasaw Cession must be gathered from the Act of Congress of July 4, 1836, by which the grant was made.

3. PUBLIC LANDS. *Act granting land to state for schools in Chickasaw Cession held not to require use for schools in particular township.*

The Act of Congress of July 4, 1836, by which land was granted to the state for the use of schools in the Chickasaw Cession, does not require any part of the land, its proceeds, or the interest theron, to be used for schools in any particular township.

4. PUBLIC LANDS. *Congressional act authorizing state to sell land reserved for schools does not affect trust under which state holds lands in Chickasaw Cession.*

The Act of Congress of May 19, 1852, authorizing the state to sell the land reserved for the use of schools, has no effect upon the terms of the trust under which the state held the lands granted to it for the use of schools in the Chickasaw Cession.

5. PUBLIC LANDS. *Upon vesting of title to school lands in Chickasaw Cession, state has full power of disposal.*

After the title of the state to the land granted to it by the Act of Congress of July 4, 1836, for the use of schools in the Chickasaw Cession had vested, the state had full power to dispose of the land without the consent of Congress, and it was also beyond the power of Congress to change the terms of the grant.

6. SCHOOLS AND SCHOOL DISTRICTS. *State agent administering trust fund for educational purpose under state law not personally liable to cestui que trust for diversion resulting from compliance with law.*

When the agent or officer of a state charged by its laws with the duty of administering a fund *held* in trust by the state for educational purposes, administers it in accordance with the laws passed by the Legislature of the state for that purpose, he is not personally liable to the cestui que trust for any diversion of the trust fund which may result because of his having disposed of it as he was directed by law so to do.

7. SCHOOLS AND SCHOOL DISTRICTS. *Neither muncipal treasurer nor district liable for diversion of interest on Chickasaw school fund where administered according to law.*

The treasurer of a municipality constituting a separate school district in receiving and disbursing the interest on the Chickasaw school fund apportioned to the separate school district under the laws of the state for the maintenance of its public

schools acts as the state's agent, and if he complies with the law in making the disbursement, neither he nor the municipality can be held liable for any diversion of such interest from the use for which the fund is held by the state, which may thereby result from the method adopted by the state for administering the trust.

APPEAL from chancery court of Alcorn county.

HON. A. J. MCINTYRE, Chancellor.

Suit by Stokes V. Robertson, State Revenue Agent, to the use of Alcorn County Chickasaw School Fund, against the city of Corinth and another. A demurrer to the bill was overruled, and defendants appeal. Reversed, demurrer sustained, and cause dismissed.

*J. M. Boone* and *W. H. Kier,* for appellant.

Complainant makes exhibit to his bill chapter 335 of the Act of Congress of 1836, approved July 4, 1836. The second section of that act is the only part of said act that bears upon the controversy in this case. Inasmuch as all of the land in the territory ceded by the Chickasaws had been sold, this Act of Congress of 1836, provided in the second section thereof that there should be reserved from sale in the state of Mississippi a quantity of land equal to one thirty-sixth part of the lands ceded by the said Chickasaws aforesaid out of any public lands remaining unsold contiguous to the said lands within said state so ceded by the Chickasaws:

"Which lands when so selected as aforesaid, the same shall vest in the state of Mississippi for the use of said territory in said state so ceded as aforesaid by the Chickasaws; and said lands, thus selected, shall be holden by the same tenure and upon the same terms and conditions, in all respects, as the said state now holds the lands heretofore reserved for the use of school in said state." Complainant's contention is that the same construction ought to be put upon this act as is expressly provided in the Acts of Congress relative to the 16th sections.

125 Miss.—3

We contend that this is an impossibility. The law with reference to the sixteenth section provides that the funds arising from the said sixteenth section shall be used within the township in which said sixteenth section is situated. But, it is impossible for this rule to apply with reference to the Chickasaw territory, as the land provided for in said Act of Congress above did not lie in any township or in any county in the Chickasaw territory and therefore the law with reference to the sixteenth section fund could not be applied.

Appellee, in the court below, as we understood him, bases his whole contention upon the last clause in said section 2 of the Act of Congress of 1836; which is in this language: "The said lands thus selected shall be holden by the same tenure and upon the same terms and conditions, in all respects, as the said state now holds the lands heretofore reserved for the use of schools in said state." It will be observed that the above clause has nothing whatever to do with the distribution of the money arising from the sale of said lands. It simply has reference to the land itself; that the land shall be held by the same tenure, terms and conditions, but not that the distribution of the funds arising from said lands should be distributed otherwise than for the use of the schools within the territory. As to how it should be distributed among the different schools in said territory is left entirely with the legislature of the state of Mississippi. The only thing the schools of the Chickasaw territory was interested in, was that they should receive one thirty-sixth part of the money arising from said lands selected in lieu of the sixteenth sections in the Chickasaw territory. It is true the land must be held just like all other land ceded to the state for school purposes should be held, same tenure, same conditions, same terms; that is to say by the same title and for the same use and purposes, no more no less.

The state of Mississippi assumed this trust of handling this Chickasaw fund arising from the lands selected and has from the beginning shown that this fund was not un-

derstood to be distributed as a township fund as a unit
rather than the county as a unit.

Chapter 3, Acts of 1848, of the legislature of Mississippi,
made provision for the disposal of the lands ceded by the
Act of Congress for the use of schools in the Chickasaw
cession, in lieu of the sixteenth sections of said cession,
and in the fifth section of said act it is provided that the
auditor of public accounts should open an account between
the state of Mississippi and the fund realized from the
lease of lands in a book to be kept for that purpose, in
which he should charge the state with the amount received
on account of said lands, and the whole amount of said
money, after deducting expenses, to be held in trust by
said state for the use of schools in the Chickasaw cession
and to be applied for that purpose as hereafter to be pro-
vided by law.

Chapter 27 of the act approved March 12, 1856, Acts of
1856-57-61, page 81, provides in the first section thereof
that the *pro rata* share of the net proceeds of the Chick-
asaw school lands to which the counties therein named, in-
cluding Tishomingo county, which at that time covered
the territory which is now called Alcorn county, together
with all monies arising from other sources, such as fines,
forfeitures, etc., and all other school funds belonging to
said counties or which may hereafter be created for them
by any law, should constitute the school fund for the same,
and section 8 of said act provided: "That nothing herein
contained shall be so construed as to prevent said com-
missioners, after providing for all proper beneficiaries,
from expending the whole of the remaining current inter-
est from time to time as equally as may be between all the
schools applying for aid." This demonstrates that the
funds arising from the Chickasaw lands were appropria-
ted to counties, as counties, independent of the question
of township.

It will be observed from the quotation of the Act of 1848,
above, that it was provided that the funds arising from
this land should be applied as hereafter to be provided by

law; and now, to put at rest how it should be applied as above provided, we find in chapter 56 of the Acts of 1856-61, pages 141-142, and in the third section of said act, the following:

"That the secretary of state is hereby required to make out and furnish to the auditor of public accounts a calculation, based on the area of territory in the Chickasaw purchase, of the proportionate amount of interest due to each of said counties; and it is hereby made the duty of said auditor to issue his warrant on the state treasury for said proportionate amount, upon application by him to said county treasurer."

It is perfectly clear from this act that the county was selected as a unit of distribution and not a township. Each county was to receive the same proportion of the money that the area of said county bore to the area of territory in the Chickasaw purchase. That is the way this fund has ever since been handled.

Complainant attaches the Laws of 1858, approved December 2, 1858, page 121, as an exhibit to his bill. By reference to said act it will be observed that the township feature is recognized, but that act, by section 5 thereof, applies only to Ittawamba county and can have no possible bearing upon any other county in Chickasaw territory.

Chapter 11, Laws of 1873, page 17, expressly declares said Chickasaw school fund should be expended annually in the maintenance of the public school system in the several counties entitled to the same.

In chapter 9, Acts of 1878, section 1, provides: "that hereafter the interest arising from the Chickasaw school fund shall be paid by the treasurers of the several counties entitled thereto upon the school warrants issued for the services rendered during the year, that said interest is distributed to the several counties, and shall be paid out in the same manner as now provided by law for expending the common school fund."

All these foregoing acts clearly and unmistakably deal with the county as a unit and not with the townships

therein.   I find no act subsequent to 1878 dealing with the
Chickasaw school fund, save only that each legislature
appropriates the interest due on the Chickasaw school
funds out of the state treasury, and this appropriation
each year has been sent to the counties as provided in the
acts hereinabove referred to; to be used as a common
school fund in the county as a unit and not the township;
that is, divided between the several separate school dis-
tricts according to the number of educable children in
said districts and territories.   This has been the custom
continuously, at least as far back as 1880.   This handling
of this fund, as set forth in the above acts, has been uni-
form, public and notorious, known by Congress, and no
complaint has ever been made by Congress as to the han-
dling of this fund by using the county as a unit instead
of the township; and we think the language of this court
in the case of *Connell, et al.* v. *Woodard et al.,* 5 Howard,
672, is appropriate.

Appellee's contention rests altogether upon implication.
They base the claim upon the facts that inasmuch as the
sixteenth section was one-thirty-sixth of a township, that
by implication the same rule should apply to the Chick-
asaw fund, inasmuch as it was provided that one-thirty-
sixth of the money arising from sale of lands in lieu of the
sixteenth section should be devoted to school purposes in
the Chickasaw territory.

The rule of distribution of the sixteenth section to each
township was not a rule of necessity, but purely an arbi-
trary rule.   Now, to give the Chickasaw fund this inter-
pretation by implication, there must be a necessity there-
for in order to carry out the real purpose of the act.   Only
those things are implied in the construction of an act as
are necessary to carry out the full purpose of the act.   The
county could be adopted as a unit in either case as well
as a township.    The object of the grant could be ac-
complished just as well by one unit as by the other, and
the adoption therefore of one method in one act does not
involve or control in the other act.   The real object and

purpose of this reservation of land was for the education of the youth of the land and could be equitably subserved under the one system as well as under the other. It is therefore unnecessary to imply anything in the act with reference to the Chickasaw fund, and if this court should put that construction upon the laws with reference to the Chickasaw territory fund by implication, it would be legislating something into the statute rather than construing the statute.

Appellee attaches to his original bill chapter Acts of Congress of 1852, United States Statute at Large, Vol. 10, page 6. This act of the Congress ratified and approved the sales of land made by the state of Mississippi prior thereto. The first section thereof provides for the sale or lease of all or any part of the lands reserved and appropriated by Congress for the use of schools within the state of Mississippi, and to invest the money arising from the sale as the said legislature may elect, for the use and support of the schools within the several townships and districts of the county for which they are originally reserved and set apart, and for no other use or purpose whatsoever; provided said lands or any part thereof shall in no case be sold or leased without the consent of the inhabitants of said township or district, to be obtained in such manner as the legislature of said state may by law direct; and provided further, that in all cases the money arising from the sales of land within a particular township and district shall be appropriated for the use of schools within the township and district.

If this act of Congress has any bearing whatever upon the issue involved in this case, then it appears clearly that the Congress had in mind the situation as it existed at that time in Mississippi, namely, that all that territory in Mississippi ceded to the state by the Chickasaw Indians had been sold and there could not be a reservation of the sixteenth section in said territory or "district of county" and that, therefore the Congress provided that the money should be for use in the several townships and

"districts of county" for which they are originally reserved. We think that "district of county" in said act referred to the district of county ceded by the Chickasaw Indians, and the only provision in the act was the money should be used for the schools in that district independent of the question of townships, as the township feature was an impossibility in the Chickasaw territory. There was evidently something in the mind of the Congress as to the situation in Mississippi other than a township; and we know of no situation to cause the Congress to use the word district in conjunction with township except this Chickasaw territory situation. It is clear that in so far as the "district of county" is concerned, the Congress did not attempt to prescribe the method of distribution of the fund in said "district of county."

The sole object and purpose of the reservation of land for school purposes was to educate the children of the state, the education of one child was just as important and as much desired as the education of any other child, and if a system is adopted by which each child has the same benefits conferred upon it as every other child, then the real purpose of the statutes, both state and congressional, is accomplished.

The paramount consideration in the distribution of school funds has always been to preserve equality and uniformity. While it may be that a separate school district that has an organization and a taxing power might be required to raise funds with which to meet a decree similar to the one sought in this suit, yet if a township or townships in a county has received more of this Chickasaw fund than it is entitled to under the rule contended for in the bill of complainant, we know of no remedy that could be resorted to to force such a township to refund the overplus received by it of this Chickasaw school fund. We would therefore have one portion of a county dealt with differently from other portions of the county. We, therefore think that our demurrer, in which we contended

that the county is a unit instead of a township, ought to be sustained.

Our fourth ground of demurrer is that this suit ought to be brought by the state and not by the county, if anyone is entitled to bring the suit. The acts of Congress place these lands and the funds arising from the sale or lease thereof in the state of Mississippi to be by it held in trust. This proposition is so clear and has been so many times so decided by this court that we only refer to the cases of *Jones* v. *Madison County,* 72 Miss. 777, and *Robertson* v. *Monroe County,* 119 Miss. 520, in which cases it is held that the state is a trustee and as a trustee has control of this school fund derived from the Acts of Congress. Alcorn county certainly has no authority whatever given to the county to control this fund for the state. The Congress nor the legislature of Mississippi has never intrusted the county with any authority to control or direct distribution of this fund.

The state has heretofore, through its legislature and departments, distributed this money among the counties as a unit and ignored the township feature contended for in the bill of complaint. If that was lawful, then it is the duty of the state to correct the ruling, and the power is lodged alone in the state and cannot be exercised by any other person or subdivision of the state.

If we are mistaken in this view, then the state ought to be sued for the improper distribution of this fund, and not the city of Corinth or the Corinth separate school district; the money is in the hands of the state. The state made the appropriation thereof and turned the same over to the separate school district of Mississippi. If this was an unlawful act, then the remedy ought to be against the party responsible therefor. The city received the money from its sovereign and certainly ought to be responsible to no one but its sovereign; so that either way you look at the matter, this suit is either brought by the wrong party or against the wrong party. One or the other propositions is true.

The special demurrer in this case ought to have been sustained. The case of *Town of Crenshaw* v. *Panola County,* 76 So. 741, does not apply; this suit is brought in the name of revenue agent for the use of Alcorn county and the Chickasaw school fund. The Chickasaw school fund has no entity as to make it a party to a suit. That part of the bill therefore must be left out of consideratino. The county of Alcorn is not shown to have any interest in the matter in controversy so as to make it the real beneficiary of the suit so as to defeat the plea of the statute of limitations. The fund sued for would go to the different townships which have not received their proper *pro rata,* if the suit is successful, and the real beneficiaries are those townships, and no constitutional or statutory enactment grants immunity against the statute of limitation to a township.

The nominal plaintiff may be a party entitled to immunity from the statute of limitations, but the test is: Is the real beneficiary such a person? If not then the statute does apply. *United States* v. *Beebe,* 127 U. S. 338, 37 L. Ed. 121; *Curtner* v. *United States,* 149 U. S. 662, 37 L. Ed. 890.

Recapitulation. First, when the meaning of a statute is doubtful, a practical construction put upon it, at the time of its passage, or soon afterwards, and universally acquiesced in for a long period of time, as shown by a general usage, will be entitled to great weight and will be accepted as the true construction, unless there are cogent reasons to the contrary. Black on Interpretation of Law, page 215.

The "usage" which is entitled to be considered in the construction of a statute is such as is practical, general and public. It may be the usage of the courts; it may be the usage of the executive and administrative officers of the government in the discharge of their duties. Black on Interpretation of Laws, page 217.

The above rule is universal; that the county has been adopted as the unit of distribution of the Chickasaw fund has been the uniform construction of the acts of the Con-

gress, by our legislature and administrative officers, consistently and continuously from the creation of this fund until the present day and no complaint has ever been made by Congress; therefore has become the law on the subject. Second, the complainant has no right of action as shown by the bill under the law. Third, the special demurrer ought to be sustained.

We submit that this case ought to be reversed and dismissed here.

*Thomas H. Johnston,* for appellee.

Appellant's contention "that, in the distribution of this Chickasaw school fund, the county as a whole should be taken as the unit for distribution according to the number of educable children therein, and not the different townships" is not tenable. The distribution of this fund is now made to the different counties strictly upon an acre, or acreage basis, and not upon the basis of the number of educable children in the county. By an act of the legislature of 1856 (chap. 56, page 142), the basis for the distribution of this fund was stipulated as the ratio of the area of the counties to the total area of the lands of the Chickasaw cession (Par. 3).

This is the present method of the distribution of this fund, the figures showing the total number of acres in each county and the total number of acres in the cession being certified to the state auditor, by the state land commissioner in May, following each regular biennial session of the legislature which makes provision for the payment of the interest on this fund by appropriation.

This method of distribution to the different counties is in accord with the terms and conditions of the trust by which the lands, originally reserved for school purposes by virtue of the Georgia compact, were held by the state; and in accord with the terms and conditions of the trust imposed by the United States when the Chickasaw school lands were granted to the state in lieu of the original six-

teenth sections.  A distribution to the counties, based up-
on the number of educable children in each county, would
be unfair to the counties of larger area and smaller num-
ber of educable children, as there was originally reserved
in each county for school purposes the sixteenth section
of each township; then each county should be entitled to
an interest in the land granted in lieu of the sixteenth
sections in proportion that its area bore to the entire area
of the Chickasaw cession.  Then to distribute the inter-
est arising from the fund created by the sale of this land
to the different counties on the basis of the number of
educable children would be manifestly unfair and contrary
to the express terms and conditions of the trust.  If this
be true it is equally as true that it would be unfair to dis-
tribute this fund, which is distributed to the counties on
an area basis to the different townships of the county up-
on the basis of the number of educable children in each
township.

In accord with the Georgia compact, by an act of Con-
gress, approved March 3, 1803, section 12 of chapter 27
(U. S. Statutes at large, Vol. 2, page 234) the sixteenth
section of every township in the then Mississippi territory
was reserved for the support of schools within the same.
Then in the outset, each township had reserved for it an
equal amount of land to be used for the support of schools
in the township; but by the treaty with the Chickasaw
Indians before mentioned, the United States violated this
compact, and the sixteenth sections were all sold.  In order
to carry into effect the existing compact, which had been
by the state of Georgia for the state of Alabama and Mis-
sissippi, Congress passed the act, approved July 4, 1836,
heretofore referred to, the state of Mississippi was granted
an amount of land equal in area to one thirty-sixth part
of the entire Chickasaw cession, in lieu of the sixteenth
section sold, and it was provided therein, "and said lands,
thus selected shall be holden by the same tenure, and upon
the same terms and conditions, in every respect, as the

state now holds lands heretofore reserved for the use of schools in said state."

The state revenue agent contends that this gave to each township in the Chickasaw cession an equal interest in the lands so reserved and set apart by said act; and that when said lands were sold by state and congressional authority, each township was entitled to an equal interest in said fund and an equal share in the interest arising therefrom.

Appellants contend that this is impossible. That the law with reference to the sixteenth section funds provides that the funds arising from the sale or lease of the sixteenth sections shall be used in the township where the sixteenth section is located. And that this is impossible in the Chickasaw cession, and this rule cannot apply because all the land was sold, and none of the land granted by the Act of 1836 is in any township or county in the Chickasaw cession. If this reasoning held good, many of the townships in the state lying outside the Chickasaw cession would be without the benefit of the township fund; for it frequently happened that the sixteenth section had already been taken up under Spanish and British land grants, before this reservation for school purposes was made by the Act of 1803. When this contingency arose, the township was granted a section in lieu of the sixteenth section, sometimes it was in the same township but frequently the lieu section was located in another township, or even in another county. In the Chickasaw cession this contingency arose, but arose as to all the sections numbered sixteen and to all the townships in the cession, and hence Congress by the Act of 1836 gives to these townships, thus deprived of their sixteenth sections, sections located elsewhere. No attempt was made under this act to select particular sections and award them to particular townships, but an amount of land equal to one thirty-sixth part of all the lands of the Chickasaw cession was to be selected from any unsold public lands in the state, and was to vest in the state of Mississippi in lieu of said sixteenth sec-

tions, and this land was to be held by the same tenure, and upon the same terms and conditions, in all respects, as the lands theretofore reserved for the use of schools.

In other words, the government was simply carrying out the existing compact with the state of Mississippi, and that compact reserved the sixteenth section of each township in the state for the support of the schools within the same. Under the original compact, and the Act of Congress of 1903, each township in the Chickasaw cession had been guaranteed an equal amount of land for school purposes within the township, then each township should have an equal interest in the lands selected under the Act of 1836, and necessarily an equal interest in funds for which said lands were sold.

Again appellants contend on page 3 of their brief that the last clause of section 2 of the Act of Congress of 1836, which is in this language, to-wit: "the lands thus selected shall be holden by the same tenure and upon the same terms and conditions in every respect, as the state now holds the lands heretofore reserved for the use of schools in said state," only has reference to the land itself, that as long as the land was held by the state, the conditions of the trust must be complied with, but if the lands were sold, there was absolutely nothing binding upon the state of Mississippi as to how the fund should be distributed. All that was required was that the funds be used for school purposes within the territory, that the distribution of this fund is left entirely to the legislature of the state.

If this be true with reference to the Chickasaw cession lands, it would apply with equal force to the reserved sixteenth sections in the other parts of the state. But the courts have long since decided that these township funds, arising from the sale or lease of the sixteenth section, or section set apart in lieu thereof, which were reserved for the use of schools within the township, cannot be diverted from the township, or used for anything else than schools within the particular township. *Morton* v. *Grenada Academy,* 8 S. & M. 786; *Bishop* v. *McDonald,* 27 Miss. 371;

*Jefferson Davis County* v. *James-Sumrall Lumber Co.,* 94
Miss. 530, 49 So. 611; *Davis* v. *Indiana,* 94 U. S. 794; *Moss
Point Lbr. Co.* v. *Harrison Co.,* 89 Miss. 571-2.

It is the contention of the state revenue agent that re-
gardless of what acts the legislature of the state of Mis-
sissippi may pass declaring how such funds shall be dis-
tributed, such acts have no binding force or effect what-
ever unless they are in accord with the terms of the trust
created.

Appellants seem to be of the opinion, from the number
of acts of the state legislature which they have cited, that
the legislature has selected the county as the unit for the
distribution of this fund. This is not the case, for in that
event each county would receive the same amount. The
fund is now distributed to the counties on an area basis,
as we have attempted to show heretofore, and no two coun-
ties receive the same amount. We contend that such dis-
tribution is in accord with the terms of the trust as far as
the counties are concerned, and we have no quarrel with
this method of distribution as far as it goes; but to com-
pletely perform the terms and conditions of the trust, the
distribution of this fund should be carried a step further,
and each township, or fractional part of a township in the
county should receive its proportionate part of the fund
in the ratio of its area.

Again appellants on page 7 of their brief contend that
the real object and purpose of this reservation of land was
for the education of the youth of the land and could be
equitably subserved under one system as well as the other;
and, on page 8, the education of one child was just as im-
portant and as much to be desired as the education of any
other child, then if a system is adopted in which each child
has the same benefits conferred upon it as every other child,
then the real purpose of the statutes, both state and con-
gressional, is accomplished. Unfortunately, appellant's
ideal method of distribution has not been adopted in this
state, for the children of some of the Chickasaw counties
received a great deal more from the interest from this fund

than the children of other counties, but under the terms of the trust, this is unavoidable. While the primary object of the reservation of this land for school purposes, as appellants suggest, is for the education of the youths of the land, this was not the only object Congress had in view when it reserved the sixteenth section of every township for the use of schools within the same. There must have been some other purpose Congress had in view, other than the education of the youth of the land, or else each state would have been granted a body of land for the use of the schools of the state, and in this event, each child would have been entitled to exactly the same amount and would have been given the same opportunity as every other child.

Appellants contend, that because of the fact that the terms of the trust have been so long violated, that this abuse should not be corrected at this late date, and that the language of the court in the case of *Connell, et al.* v. *Woodward, et al.,* 5 Howard, 672, is appropriate in this case. In that case it was contended on the one hand that the Act of 1803, which reserved from sale the sixteenth section in every township in the state to be used for the support of the schools within the same, was a grant to the state of this land for the purposes therein named, and the state would hold the legal title as trustee; while on the other hand it was contended that the legal title to the land never vested in the state but remained in the United States and that the legislature of the state could not give the trustees, or any other person, any authority over the sixteenth sections. And the court deciding the case in favor of the first contention, made use of the language quoted by appellants.

Appellants further contend that the words, "and provided further, that in all cases the money arising from the sales of lands within a particular township and district shall be appropriated for the use of schools within the township and district," as appears in chapter 35, Acts of Congress, 1852 (Statutes at Large, Vol. 10, page 6), which act

ratifies the sale or lease of the school lands theretofore made by the state, and authorizes further sale or lease of the remaining lands reserved for school purposes, shows that it was the intention of Congress that the money arising from the sale or lease of the lands granted the state of Mississippi in lieu of the sixteenth sections of the Chickasaw cession, should be used for the schools in that territory independent of the question of townships; and that Congress did not attempt to prescribe the method of the distribution of the funds in said district of the county, and that district or county, meant the Chicksaw cession.

It does not at all follow that this was the congressional intent. In this act Congress ratified the sales already made by the state and authorized further sales, and the state was only given unlimited authority as to the manner in which the funds should be invested. It is expressly stipulated in this act that the funds should be used for the use and support of the schools within the several townships and district of county for which they were originally reserved, and for no other use or purpose whatever. What was the condition at that time? In a part of the state, the terms of the Georgia compact, and the provisions of the Act of 1803, had been complied with, and the sixteenth section of every township, or sections given in lieu thereof, had been reserved for the use of schools within said townships; hence Congress, by the act referred to, directs that the funds arising from these sections shall be used in the township for which they were originally reserved for school purposes and for no other use whatever. That as to the other school lands, that is to say, the lands granted the state by the United States in lieu of the sixteenth sections, sold in the Chickasaw cession, the funds arising from the sale of these lands could not be used for schools outside this district or territory, but the act nowhere abrogates the terms upon which the state took these "lieu" lands, and those terms had been made specific and definite by the Act of 1836, which provided that these lands were to be held by the same tenure, and upon the same condi-

tions and terms, in every respect as the sixteenth section lands were held, and one of these terms and conditions was that the fund should be used "for the support of schools within the township."

The Act of 1852 does not give any method for the distribution of the fund, further than to provide that it must be used for schools within the district. This was not necessary; the terms had already been given in unequivocal language. Why should Congress make a distinction between the townships of the southern and the northern parts of the state? The same condition prevailed in both, and originally the same reservation for school purposes of the sixteenth section in every township had been made for the entire state.

In construing the Act of Congress of 1836, by virtue of which these lands vested in the state of Mississippi, we should take into consideration not only the plain language of the statute itself, but also look to the title of the act, to ascertain the congressional intent. This act is entitled, an act to carry into effect, in the states of Alabama and Mississippi, the existing compacts with those states with regard to the five per cent. fund and the school reservations." Thus congress states that by this act, it is intended to carry into effect the existing compact with the state of Mississippi regarding the "school reservations." What was this existing compact? The state of Georgia, when it ceded the territory now comprising the states of Alabama and Mississippi, ceded the territory on certain conditions, one of which was that the sixteenth section of every township should be reserved for the support of schools within the township. Congress by the Act of 1803, in carrying out this compact, reserved the sixteenth section in every township for the support of schools within the same. By the treaty with the Chickasaw Indians, heretofore referred to, the United States violated this compact, and the sixteenth sections of the Chickasaw cession were all sold; then to carry into effect the existing compact, Congress passed the Act of 1836, which provides that a certain

amount of the public lands shall be selected, which amount shall be equal in area to one thirty-sixth part of the entire area of the lands ceded by the Chickasaws, and the lands thus selected shall vest in the state of Mississippi for the use of schools in said territory, and said lands shall be holden by the same tenure, and upon the same terms and conditions, in every respect, etc. What were the terms and conditions upon which the lands were originally reserved for school purposes. The only terms or conditions laid down in the original reservation, and in the Act of 1803, was that the sixteenth section is reserved for the support of schools within the township and if these were not the terms and conditions on which these lands were held, we are at a loss to know what terms and conditions were referred to. Whatever these terms and conditions were upon which these sixteenth sections were originally reserved, it is evident from the plain language of the Act of 1836, that Congress wanted the same terms and conditions imposed upon the lands granted in lieu of the sixteenth sections sold in the Chickasaw cession as obtained on the original reservations thereof, for the Congress, after providing that these lands shall be held upon the same terms and conditions as the lands heretofore reserved for the use of school in the state, to make its meaning clear and emphatic, adds the words, in every respect. If the original compact, the Act of 1803, and the Act of 1836 are construed together, also taking into consideration the conditions which prevailed at the time, it is the manifest intention of Congress that the Chickasaw school funds are township funds, and, as in the sixteenth section funds, the integrity of the same as a township fund should remain inviolate, to the end not only that the youths of the state might be educated but that the entire country might be more uniformly settled and developed.

Appellants contend, in support of their fourth ground of demurrer, that the county is without authority to bring such suit, and that it should have been brought in the name of the state. The case of *Jones* v. *Madison Co.,* 72 Miss.

777, cited by appellants, nowhere holds, as far as we have been able to ascertain, that the county is without authority to bring the suit; but it does hold as appellants contend that the state holds these lands in trust for the different townships.

In the case of *Robertson* v. *Monroe Co.*, 118 Miss. 520, also cited by appellants, the county had borrowed some of the sixteenth section funds and agreed to pay interest on the same, and if the interest were not used, to reinvest the same. The county neglected and refused, upon demand being made, to pay this interest, and the court at page 537 said:

"Manifestly, the board of supervisors could not be a party defendant and a party complainant, and under the allegations of the bill, the board refused, when requested and directed to make payment to do so. We think in this case that the state had the right to bring the suit as trustee, etc."

Appellants again fall into the error of saying that the state heretofore, though its legislature and departments has distributed this money to the county as a unit and ignored the township. It is true that under chapter 56, Laws of 1856, and all laws passed by the legislature subsequent thereto, it is provided that the interest from the Chickasaw school fund should be paid to the county treasurer of each county in the cession at certain specified times; but, as we have attempted to point out before, the fund is not distributed to the counties as a unit, nor is it distributed to the counties upon the basis of the number of educable children in each, for the above mentioned act provides specifically that distribution is to be made to the counties on an area basis upon the ratio therein set out. Under this act each county gets the amount of interest that the townships and fractional parts of the townships therein are entitled to, but no more, and each county is certainly entitled to no less. We contend that this method of distribution as far as it goes is correct and in accord with the terms and conditions of the trust, and the state

has nothing to correct insofar as the county is concerned.

Appellants say that if they are mistaken in the state's power to bring this suit, then the state itself ought to be sued for the improper distribution of this fund, and not the city of Corinth and the Corinth separate school district. Appellants say, in this connection, the state made the appropriation thereof and turned the same over to the separate school district. Appellants say, in this connection, the state made the appropriation thereof and turned the same over to the separate school districts of Mississippi. And if this were an unlawful act, then the remedy should be against the state. Again appellants are mistaken; these funds are not turned over by the state to the separate school districts, but are paid directly into the county treasury, and is then paid out by the county treasurer.

The statutes, regulating the right of the counties to sue are three in number. Section 4850, Code of 1906 (section 3170, Hemingway's Code), provides: "The state shall be entitled to bring all actions and all remedies which individuals are entitled to in a given case, etc." Section 4806, Code of 1906 (section 3171, Hemingway's Code), provides that "any county may have like remedies to recover any property belonging to it, or damages for injury thereto; and actions may be brought in behalf of the county, either by a district attorney or some one employed by the board of supervisors." The county has the right to sue for and recover any property belonging to it, and we contend that the term property belonging to it, is broad enough in its scope and meaning not only to cover property, the ownership of which is absolutely in the county, but also property in which the county has a qualified ownership, or of which it has possession, or has under its control.

Section 309, Code of 1906 (section 3682, Hemingway's Code), provides, that "any county may sue and be sued by its name, and suits against the county shall be instituted in the court having jurisdiction of the amount sitting at the county site; but suit shall not be brought by the county without the authority of the board of supervisors, ex-

cept as otherwise provided by law.  And section 310, Code of 1906 (section 3683, Hemingway's Code), provides that, suit may be brought in the name of the county, where only a part of the county or of its inhabitants are concerned, and where there is a public right of such party to be vindicated.

In the case of *Warren Co.* v. *Gans,* 80 Miss. 76, 31 So. 539, it was held that the county could bring suit or an action in replevin for logs cut for sale from sixteenth section lands leased in 1834 for ninety-nine years.  If the county had the right to sue in a case of replevin for logs cut from a sixteenth section, why should it not have the right to sue for a misappropriation of the Chickasaw school fund, after the same has been paid into the county?

We take it that appellants will not contend that the state revenue agent is without authority to bring this suit if the county is entitled to sue, even if suit is not authorized by the board of supervisors, for section 7056, Hemingway's Code gives him this authority.

In the case of *Robertson* v. *Monroe Co.,* 70 So. 187, it was held by this court that the state revenue agent may sue a county for the use and benefit of a city, then the converse of this proposition must also be true that the state revenue agent may sue a city for the use and benefit of the county.

If we are correct in our contention in this case that the county has such an interest in the Chickasaw school fund, as would give it the right to sue for a wrongful disposition of the same, after it has been paid into the county treasury, then the court below was correct in overruling appellants special demurrer under the authority of *Town of Crenshaw* v. *Panola Co.,* 76 So. 741.

We respectfully submit that the case should be affirmed and remanded for an accounting.

Smith, C. J., delivered the opinion of the court.

The revenue agent exhibited an original bill in the court below for the use of the county of Alcorn against the city

of Corinth by which he seeks to recover from the city several thousand dollars alleged to have been received by the city since 1892 from the interest on the Chickasaw school fund for the use of its separate school district in excess of its rightful share thereof. A demurrer to the bill was overruled.

The Chickasaw school fund was obtained by the state from the sale of the land set apart to the state of Mississippi for the use of schools within the territory ceded to the United States by the Chickasaw Indians and in which territory the county of Alcorn, in which is the city of Corinth, is situated. The city of Corinth was formed into a separate school district in 1892. The interest on this fund fixed by section 212 of the present state Constitution at six per centum per annum is applied by the state to the support of public schools in the Chickasaw territory under the provisions of chapter 56, Laws of 1856.

The contention of the revenue agent is that under the act of Congress by which the land was set apart to the state the interest on this fund should be equally divided among the townships in the territory ceded to the United States by the Chickasaw Indians, and not as provided in chapter 56 of the Laws of 1856, and that, because of this alleged violation of its trust by the state, the city of Corinth has received for the maintenance of its separate school district more than its share of this interest which sum the revenue agent seeks to recover for the county for the use of public schools in the townships therein other than the township in which the city of Corinth is situated.

In order that the ground of the revenue agent's contention may be properly understood, it will be necessary to examine the various laws and treaties under which the sections No. 16, and the land from which the fund here in question was derived, were set apart by the United States to the state of Mississippi for school purposes.

The territory ceded to the United States by the Chickasaw Indians was formerly a part of and was ceded by the state of Georgia to the United States in 1802 by Articles

of Cession and Agreement, the fifth section of the first article of which provides:

"That the territory thus ceded shall form a state, and be admitted as such into the Union, as soon as it shall contain sixty thousand free inhabitants, or at an earlier period if Congress shall think it expedient, on the same conditions and restrictions, with the same privileges, and in the same manner as if provided in the ordinance of Congress of the thirteenth day of July, one thousand seven hundred and eighty-seven, for the government of the western territory of the United States; which ordinance shall, in all its parts, extend to the territory contained in the present act of cession, that article only excepted which forbids slavery." Mississippi Code of 1823, p. 504; Mississippi Code of 1857, p. 646.

Article 3 of the Ordinance of July 13, 1787, referred to in the Articles of Cession and Agreement, is as follows:

"Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and, in their property, rights, and liberty, they shall never be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity, shall, from time to time, be made for preventing wrongs being done to them, and for preserving peace and friendship with them." Laws of the United States, Resolutions of Congress under the Confederation, etc., Relating to the Public Lands, p. 360.

The territory so ceded, together with territory south of it, was afterwards, with the consent of the state of Georgia, formed into the states of Alabama and Mississippi.

On the 3d day of March, 1803, Congress enacted a statute entitled:

"An act regulating the grants of land, and providing for the disposal of the lands of the United States south of the state of Tennessee."

Which act, after providing for the disposition of a portion of the land therein dealt with, continues in sections 10, 11, and 12, as follows:

"That a surveyor of the lands of the United States, south of the state of Tennessee, shall be appointed, whose duty it shall be  .  .  .  to cause the lands above mentioned, to which the titles of the *Indian tribes have been extinguished* [italics supplied], to be surveyed and divided in the manner hereafter directed.

"  .  .  .  The said surveyor shall also cause all the other lands of the United States, in the Mississippi territory, *to which the Indian title has been extinguished* [italics supplied], to be surveyed as far as practicable, into townships, and subdivided into half sections, in the manner provided for the surveying of the lands of the United States, situate northwest of the river Ohio, and above the mouth of the Kentucky river.  .  .  .

"That all the lands aforesaid, not otherwise disposed of, or excepted by virtue of the preceding sections of this act, shall, with the exception of the section number sixteen, which shall be reserved in each township for the support of schools within the same,  .  .  .  be offered for sale," etc.

2 Stat. at Large, 229; Mississippi Code of 1823, p. 511; Mississippi Code of 1857, p. 647.

On April 21, 1806, Congress enacted a statute (2 Stat. 400) amending or supplementing the Act of March 3, 1803, the sixth section of which provides:

"Whenever the section number sixteen shall fall upon land already granted, by virtue of any act of Congress, or claimed by virtue of a British grant, the secretary of the treasury shall locate another section in lieu thereof, for the use of schools, which location shall be made in the same township, if there be any other vacant section therein, and otherwise, in an adjoining township."  Code of 1823, p. 518; Code of 1857, p. 657.

The title of the Choctaw Indians to the land in the Mississippi territory occupied by them was extinguished in

September, 1830, by the treaty of Dancing Rabbit Creek by which the United States ceded to the Choctaw nation— "A tract of country west of the Mississippi river, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it," etc.

And the Choctaws ceded to the United States—"The entire country they own and possess east of the Mississippi river." Mississippi Code of 1857, p. 707.

The title of the Chickasaw Indians to the land in the Mississippi territory occupied by them was extinguished in October, 1832, by the treaty of the Pontotoc Creek by which the Chickasaw nation ceded—"to the United States all the land which they own on the east side of the Mississippi river, including all the country where they at present live and occupy."

And the United States agreed to sell all of the land thereby ceded to it, and—"As a full compensation to the Chickasaw nation, for the country thus ceded, the United States agree to pay over to the Chickasaw nation all the money arising from the sale of the land," etc. Mississippi Code of 1857, p. 714.

One of the results of the treaty between the United States and the Chickasaw Indians was that the sixteenth sections situated in the land theretofore occupied by the Chickasaw Indians never became available to the state of Mississippi for school purposes.

On July 4, 1836, Congress enacted a statute entitled:

"An act to carry into effect, in the states of Alabama and Mississippi, the existing compacts with those states in regard to the five per cent. fund, and the school reservations."

Section 2 of which provides:

"That there shall be reserved from sale, in the state of Mississippi, a quantity of land, equal to one thirty-sixth part of the land ceded by said Chickasaws as aforesaid, within said state of Mississippi, which land shall be selected under the direction of the Secretary of the Treasury, in sections, or half sections, or quarter sections, out

of any public lands remaining unsold, that shall have been offered at public sale within either of the land districts in said state of Mississippi, contiguous to said lands within said state, so ceded by the Chickasaws as aforesaid; which lands, when so selected as aforesaid, the same shall vest in the state of Mississippi, for the use of schools within said territory in said state, so ceded as aforesaid by the Chickasaws; and said lands, thus selected, shall be holden by the same tenure, and upon the same terms and conditions, in all respects, as the said state now holds the lands heretofore reserved for the use of schools in said state." Mississippi Code of 1857, p. 682; 5 U. S. Stats. at Large, p. 116.

On May 19, 1852, Congress enacted a statute "to authorize the legislature of the state of Mississippi to sell the lands heretofore appropriated for the use of schools in that state, and to ratify and approve the sales already made," which reads as follows:

"That the legislature of the state of Mississippi shall be, and is hereby authorized to sell and convey in fee-simple, or lease, for a terms of years, as the said legislature may deem best, all or any part of the lands heretofore reserved and appropriated by Congress for the use of schools within said state, and to invest the money arising from said sales, as said legislature may direct, for the use and support of schools within the several townships and districts of country for which they were originally reserved and set apart, and for no other use, or purpose whatsoever: Provided, said lands or any part thereof, shall, in no case, be sold or leased without the consent of the inhabitants of such township or district to be obtained in such manner as the legislature of said state may by law direct; and provided further, that in all cases, the money arising from the sales of lands within a particular township and district, shall be appropriated to the use of schools within that township and district. . . .

"That sales heretofore made by the authority of the legislature of the state of Mississippi of lands reserved

and appropriated as aforesaid, are hereby ratified and approved in the same manner and to the same extent, as if this act had been in force at the time of said sales."

10 Stat. at Large, p. 6; Mississippi Code of 1857, p. 696.

The land set apart to the state by the Act of Congress of July 4, 1836, was sold and the money received therefor was paid into the state treasury under the provisions of chapter 3, Mississippi Laws of 1848, the fifth section of which provides that the money so received shall be paid into the treasury, and "shall be a charge upon the state of Mississippi, to be held in trust by said state for the use of schools in the Chickasaw cession, and to be applied to that purpose as hereafter to be provided by law."

In 1856 the state legislature enacted a statute, chapter 56, Laws of 1856, the third and tenth sections of which provide:

"That the secretary of state is hereby required to make out and furnish to the auditor of public accounts, a calculation, based on the area of territory in the Chickasaw purchase, of the proportionate amount of interest due to each of said counties; and it is hereby made the duty of said auditor to issue his warrant on the state treasurer for the said proportionate amount, upon application to him by said county treasurer, in person, or attorney in fact, accompanied with satisfactory proof that said county treasurer has fully complied with the requirements of this act. . . .

"That the interest moneys in each county shall be held subject to the order of the board of school commissioners of such county, which is hereby authorized to expend the same in accordance to the existing laws, or laws that may be hereafter passed, applicable to the respective counties of the Chickasaw purchase, in relation to common schools."

Since the enactment of this statute the interest on this fund has been remitted to the county treasurers in accordance with its provisions except that the memoranda on which the auditor apportions it to the counties is now fur-

nished him by the Land Commissioner. The statutes (Hemingway's Code, section 7387) in force when and since the Corinth separate school district was formed provide that the county common school fund shall be divided between the separate school districts of a county and that portion of a county not included in separate school districts on the basis of the number of educable children in each, and that—

"The county treasurer shall . . . pay over to the treasurer of a municipality in his county which is a separate school district, all money to which the spearate school district may be entitled; and the treasurer of each municipality which is a separate school district, shall perform like duties as are devolved on county treasurers, as far as applicable in reference to money for the support of schools."

The interest here in question, as we understand the allegations of the bill, was disposed of by the state, county, and municipal treasurers in accordance with the foregoing provisions of the statutes.

The contention of the revenue agent as set forth in the bill of complaint is that—

"It was the intention of the Congress of the United States that the lands so selected and reserved for the use of the schools in the Chickasaw Cession and the interest arising from the fund realized from the sale of said lands should be distributed *pro rata* to the townships and fractional parts of a township being in said Cession, that such distribution should be made upon the basis that the ratio of the area of each township, or fractional part of a township, bears to the total area of said cession in said state, to the end that each township or fractional part should have an amount equal in proportion to its area for the use of schools therein, and thus bring about and produce as nearly an equal and uniform development and settlement of all parts of said Chickasaw Cession, and that the state of Mississippi so holds said fund in trust for the use of

the schools, as aforesaid, and upon the terms and condi-
tions aforesaid."

In support of this contention it is said that the Ordi-
nance of July 13, 1787, incorporated by reference into the
Articles of Cession and Agreement, by which the state of
Georgia ceded her western territory to the United States,
reserved the sections No. 16 therein for the use of schools
in the townships wherein they are situated, and that the
United States violated this agreement with the state of
Georgia when it sold the sections No. 16 in the Chickasaw
territory pursuant to the treaty with the Chickasaw In-
dians, and, in order to right the wrong thereby done, Con-
gress set apart to the state of Mississippi, by the Act of
July 4, 1836, an area of land equal to the area of all of
the sections No. 16 in the Chickasaw territory "for the
use of schools within said territory" to be holden by the
state "upon the same terms and conditions, in all respects,
as the said state now holds the lands heretofore reserved
for the use of schools in said state," which act, when con-
strued in the light of the wrong thereby sought to be right-
ed, must be held to have reserved the land for the use of
the schools in all the townships in the Chickasaw terri-
tory, each township to share equally therein with each of
the other townships.

There is no foundation in fact for the charge that the
United States violated its agreement with the state of
Georgia in selling the sections No. 16 in the Chickasaw
territory, or that the state of Mississippi is violating its
trust in distributing in accordance with chapter 56, Laws
of 1856, the interest on the fund derived from the sale of
the land set apart to it by the Act of Congress of July 4,
1836, for use of schools in the Chickasaw territory.

Neither the Articles of Cession and Agreement by which
Georgia ceded her western territory to the United States,
nor the Ordinance of Congress of July 13, 1787, for the
government of the western territory of the United States
therein referred to, set apart·any land whatever for the
use of schools, the only reference to schools in either of

them and the only obligation assumed by the United States in this connection is that contained in article 3 of the Ordinance that—

"Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Laws of the United States, Resolutions of Congress under the Confederation, etc., Relating to the Public Lands, p. 360.

The setting apart of the sections No. 16 in each township for the use of schools within the township was initiated by the Ordinance of May 20, 1785, for "disposing of lands in the western territory," Laws of the United States, Resolutions of Congress under the Confederation, etc., Relating to Public Lands, p. 349, and thereafter became the government's settled policy, so that when it came to comply with its agreement with the state of Georgia it did set apart, by the Act of March 3, 1803, each section No. 16 in the territory ceded to it by that state for the use of schools in the townships, but it was expressly provided therein that the land should be surveyed and the townships and sections thereby located when the title of the Indian tribes thereto should be extinguished. By this statute the state acquired the right to each sixteenth section in the designated territory, when, but not until, the Indians' right of occupancy was extinguished and the section had been surveyed as provided by law. *Gaines* v. *Nicholson,* 9 How. 356, 13 L. Ed. 173; *Cooper* v. *Roberts,* 18 How. 173, 15 L. Ed. 338; *Beecher* v. *Wetherby,* 95 U. S. 517, 24 L. Ed. 440.

Not only is it expressly provided in the Ordinance of July 13, 1787, referred to in the Articles of Cession and Agreement by which the state of Georgia ceded the western territory to the United States, that "the utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent," but such had then become and there-

after continued to be the government's settled policy in dealing with the Indians in accordance with which not only the acts of Congress here in question, but all other acts of Congress under which the public lands were disposed of, made the sale thereof, or the reservation of parts thereof for the use of schools, dependent upon the extinguishment of the title of the Indians thereto, so that in its treaty with the Chickasaw Indians the United States, instead of violating its agreement with Georgia, complied both with the letter and the spirit thereof.

Whether the sixteenth sections were donated to the state of Mississippi by the state of Georgia, as was said to be the case in *Jones* v. *Madison County,* 72 Miss. 778, 18 So. 87, or whether they were donated to the state by the United States pursuant to its general policy for the support of schools and its agreement with the state of Georgia, as seems to be the fact, it is true that the land from which the fund here in question was derived was given to the state by the United States in lieu of the sections No. 16 which did not become available to the state because of the treaty with the Chickasaw Indians, nevertheless the terms of the trust upon which the land was given must be gathered from the act of Congress of July 4, 1836, by which the grant was made, from which it appears that the grant was "for the use of schools within said territory in said state, so ceded as aforesaid by the Chickasaws," without any provision that any particular portion thereof or its proceeds should be devoted to the use of schools in any particular portion of the territory for the use of schools within which the land was granted. The provision in the act that the land "shall be holden by the same tenure and upon the same terms and conditions, in all respects, as the said state now holds the lands heretofore reserved for the use of schools in said state," refers, not to the territory within which the land should be used for school purposes, but to the terms and conditions on which the land should be held by the state for the use of schools within the designated territory.

The Act of Congress of May 19, 1852, authorizing the state to sell the land reserved therein for the use of schools, can have no effect upon the terms of the trust under which the state held the land from which the fund here in question was derived, for two reasons: First, when the act was passed the state's title to the land had fully vested so that it was then beyond the power of Congress to change the terms of the grant and the state had full power to dispose of the lands without the consent of Congress. *Cooper* v. *Roberts,* 18 How. 173, 15 L. Ed. 338; *Jones* v. *Madison County,* 72 Miss. 778, 18 So. 87. Second, the act simply provides that the money arising from the sale of the lands shall be used for the support of schools within the territory for the support of schools in which the land was originally reserved.

But if we should be mistaken as to this, the result here would be the same, for in administering the trust the state must act through its legislature, and in so doing "assumes the same measure of responsibility that pertains to it in the exercise of its law-making power. No other mode can be suggested in which a state can manage a fund for charitable uses. It must by statute derive the machinery to carry out the object. If the agent or officer of the state, acting under the law, disobeys its injunctions, transcends his powers, or refuses altogether to act then it is in the jurisdiction of the judicial department to restrain his illegal acts and compel him to conform to the law." *State* v. *Vicksburg, etc., R. Co.,* 51 Miss. 361. But when the agent or officer of the state charged by its laws with the duty of administering the trust, administers it in accordance with such laws, he cannot be called in question for so doing and is not personally liable to the *cestui que trust* for any diversion of the trust fund which may result because of his having disposed of it as he was directed by law so to do. The state in administering a trust acts in its sovereign capacity, and the acts of its administrative officers in so far as they obey its commands are the

acts of the state for which it alone is responsible unless the Constitution should provide otherwise.

The treasurer of the city of Corinth in receiving and disbursing the interest on the fund here in question, which was paid over to him by the treasurer of Alcorn county for the use of the Corinth separate school district, acted simply as the state's agent, and since he complied with the law in making the disbursement he cannot be held liable for any diversion of the interest on the fund which may have resulted from the method adopted by the state for administering the trust. The city of Corinth for the same reason cannot be held liable therefor assuming for the sake of the argument that a municipality constituting a separate school district is liable for the misuse of common school funds by its officials charged by law with the management thereof.

Whether or not an injunction would lie to prevent the state's agent from disposing of trust funds of which the state is the trustee in violation of the terms of the trust, though in accordance with the laws adopted by the legislature for administering the trust, is not before us and is not intended to be here decided, though necessarily included in the further observations now to be made.

Another question presented by this record, a decision of which is not necessary for the final disposition of this case and which is referred to only that it may not appear to have been inferentially decided by what has heretofore been said, is: Can the state's administration of the trust be called in question in one of its courts and the court's judgment as to the obligation assumed by the state in accepting the trust, and as to how that obligation should be discharged, be substituted for the judgment of the state's legislature? In which connection the cases of which the following are a type will be of interest: *State* v. *Vicksburg, etc., R. Co.,* 51 Miss. 361; *Cooper* v. *Roberts,* 18 How. 173, 15 L. Ed. 338; *Mills County* v. *Burlington, etc., R. Co.,* 107 U. S. 557, 2 Sup. Ct. 654, 27 L. Ed. 578; *County of Cook* v. *Calumet, etc., Dock Co.,* 138 U. S. 635, 11 Sup.

125 Miss—5

Ct. 435, 34 L. Ed. 1110; *Morton* v. *Grenada Academies,* 8 Smedes & M. 773; *Davis* v. *Indiana,* 94 U. S. 792, 24 L. Ed. 320.

In *Cooper* v. *Roberts, supra,* the court in deciding that a state has the right to sell the sixteenth sections reserved for the use of its schools without the consent of Congress used this significant language:

"The trusts created by these compacts relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive. In the present instance, the grant is to the state directly, without limitation of its power, though there is a sacred obligation imposed on its public faith."

It follows from the foregoing views that the demurrer to the bill of complaint should have been sustained.

The decree of the court below will be reversed, the demurrer sustained, and the cause dismissed.

*Reversed.*