# PAPASAN, SUPERINTENDENT OF EDUCATION, ET AL. *v.* ALLAIN, GOVERNOR OF MISSISSIPPI, ET AL.

No. 85–499. Argued April 22, 1986—Decided July 1, 1986

WHITE, J., delivered the opinion of the Court, in which O'CONNOR, J., joined; in Parts I and III of which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined; and in Part II of which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 292. BLACK-MUN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 293. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 295.

*T. H. Freeland III* argued the cause for petitioners. With him on the briefs were *T. H. Freeland IV* and *Orma R. Smith, Jr.*

*R. Lloyd Arnold,* Assistant Attorney General of Mississippi, argued the cause for respondents. With him on the brief for respondents Allain et al. were *Edwin Lloyd Pittman,* Attorney General, *pro se,* and *Robert E. Sanders,* Special Assistant Attorney General. *Constance Slaughter-Harvey* filed a brief for respondents Molpus et al.

JUSTICE WHITE delivered the opinion of the Court.

In this case, we consider the claims of school officials and schoolchildren in 23 northern Mississippi counties that they

are being unlawfully denied the economic benefits of public school lands granted by the United States to the State of Mississippi well over 100 years ago. Specifically, we must determine to what extent these claims are barred by the Eleventh Amendment and, with respect to those claims that are not barred, if any, whether the complaint is sufficient to withstand a motion to dismiss for failure to state a claim.

## I

The history of public school lands in the United States stretches back over 200 years.[1] Even before the ratification of the Constitution, the Congress of the Confederation initiated a practice with regard to the Northwest Territory[2] which was followed with most other public lands that eventually became States and were admitted to the Union. In particular, the Land Ordinance of 1785, which provided for the survey and sale of the Northwest Territory, "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township. . . ." 1 Laws of the United States 565 (1815).[3] In 1802, when the eastern portion of the

---

[1] Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record, such as documentation of the history of the Mississippi and other school lands grants. The historical facts recited here comprise in large part the factual allegations of the complaint and are not disputed by the parties; the parties disagree only on the legal significance of these facts.

[2] The Northwest Territory, obtained by the United States by virtue of cessions of western land claims from the original 13 States, included the land south of Canada, north of the Ohio River, east of the Mississippi River, and west of the original States. P. Gates, History of Public Land Law Development 72 (1968).

[3] The Land Ordinance of 1785 also initiated a land-surveying practice that was first applied to the Northwest Territory but that was applied to all territories acquired by the United States thereafter:

"At the point where the Ohio River crosses the Pennsylvania border, a north-south line—a principal meridian—was to be run and a base line westward—the geographer's line—was to be surveyed; parallel lines of longitude and latitude were to be surveyed, each to be 6 miles apart, making for

Northwest Territory became what is now the State of Ohio, Congress granted Ohio the lands that had been previously reserved under the 1785 Ordinance for the use of public schools in the State. 2 Stat. 175.[4]

Following the Ohio example of reserving lands for the maintenance of public schools, "'grants were made for common school purposes to each of the public-land States admitted to the Union. Between the years of 1802 and 1846 the grants were of every section sixteen, and, thereafter, of sections sixteen and thirty-six. In some instances, additional sections have been granted.'" *Andrus* v. *Utah*, 446 U. S. 500, 506–507, n. 7 (1980) (quoting *United States* v. *Morrison*, 240 U. S. 192, 198 (1916) (footnotes omitted)). Thus, the basic Ohio example has been followed with respect to all but a few of the States admitted since then. 446 U. S., at 522–523, n. 4 (POWELL, J., dissenting). In addition to the school lands designated in this manner, Congress made provision for townships in which the pertinent section or sections were not available for one reason or another. Thus, Congress generally indemnified States for the missing designated sections, allowing the States to select lands in an amount equal to and in lieu of the designated but unavailable lands. See, *e. g.*, ch. 83, 4 Stat. 179 (1826). See generally *Andrus* v. *Utah*, *supra*, at 507–508; *Morrison*, *supra*, at 200–202.

---

townships of 36 square miles or 23,040 acres. . . . Each township was to be divided into lots of one mile square containing 640 acres." *Id.*, at 65.

Each of these 1-square-mile lots was called a "section," so the section numbered 16, reserved for the public schools, was the "Sixteenth Section."

[4] The precise reasons for this practice are somewhat unclear, but it seems likely that they were a combination of an overall practice of encouraging education, a congressional desire to accelerate the disposition of western lands at a higher price, and a policy of trying to put the public-lands States on some sort of a par with the original States in terms of taxable property since federal land, a large portion of the new States, was not taxable by them. See generally *Andrus* v. *Utah*, 446 U. S. 500, 522, 523 (1980) (POWELL, J., dissenting); P. Gates, *supra* n. 2, at 288–289; B. Hibbard, A History of the Public Land Policies 309–311 (1939).

Although the basic pattern of school lands grants was generally consistent from State to State in terms of the reservation and grant of the lands, the specific provisions of the grants varied by State and over time. See generally B. Hibbard, A History of the Public Land Policies 314–318 (1939). For example, in Indiana and Alabama, the school lands were expressly granted to the inhabitants of the townships directly. See 3 Stat. 290 (1816) (Indiana); 3 Stat. 491 (1819) (Alabama).[5] In most of the other grants before 1845, the school lands were given instead to the States but were explicitly designated to be for the use of the townships in which they lay. See, e. g., 2 Stat. 233–234 (1803) (Mississippi); 3 Stat. 375 (1817) (same); 5 Stat. 58 (1836) (Arkansas). The Michigan grant in 1836, on the other hand, was simply "to the State for the use of schools." See 5 Stat. 59. After 1845, the type of grant used in Michigan, granting the lands to the State for the use of its schools generally, became the norm. See, e. g., 9 Stat. 58 (1846) (Wisconsin); 11 Stat. 383 (1859) (Oregon). Finally, the most recent grants are phrased not as outright gifts to the States for a specific use but instead as express trusts. These grants also are stated to be to the States for the support of the schools in those States generally. In addition, though, under these grants the State is specifically designated a trustee, there are explicit restrictions on the management and disposition of the lands in trust, and the Federal Government expressly retains an ongoing oversight responsibility. See, e. g., 36 Stat. 574 (1910) (Arizona and New Mexico).

The history of the school lands grants in Mississippi generally follows the pattern thus described. In 1798, Congress created the Mississippi Territory, which included what is now about the southern third of the States of Mississippi and Ala-

---

[5] At least in Alabama, however, this technical grant of the lands to the inhabitants of each township was apparently interpreted as vesting legal title in the State itself. See, e. g., *Alabama* v. *Schmidt*, 232 U. S. 168, 172 (1914).

bama. 1 Stat. 549. In 1803, Congress provided for the sale and survey of all Mississippi Territory lands to which Indian title had been extinguished but excepted "the section number sixteen, which shall be reserved in each township for the support of schools within the same." 2 Stat. 233–234. In 1804, the Mississippi Territory was extended northward to the southern boundary of Tennessee. 2 Stat. 305. Two years later, Congress authorized the selection of lands in lieu of unavailable Sixteenth Sections in the Territory. 2 Stat. 401 (1806). Eventually, in 1817, Mississippi was admitted as a State, and a further Land Sales Act provided for the survey and sale of those lands in the northern part of the new State that had not been covered by the 1803 Act. The 1817 Act provided that these lands were to be "surveyed and divided in the manner provided by law for the surveying of the other public lands of the United States in the Mississippi territory"; thus, the Act required that "the section No. 16 in each township . . . shall be reserved for the support of schools therein." 3 Stat. 375 (1817). The Sixteenth Section lands and lands selected in lieu thereof were granted to the State of Mississippi. See *Lambert* v. *State*, 211 Miss. 129, 137, 51 So. 2d 201, 203 (1951).

By their own terms, however, these Acts did not apply to the lands in northern Mississippi that were held by the Chickasaw Indian Nation, an area essentially comprising what came to be the northern 23 counties in the State. This land was held by the Chickasaws until 1832, when it was ceded to the United States by the Treaty of Pontitoc Creek. 7 Stat. 381. Although that Treaty provided that the land would be surveyed and sold "in the same manner and on the same terms and conditions as the other public lands," *id.*, at 382, no Sixteenth Section lands were reserved from sale. *City of Corinth* v̈. *Robertson*, 125 Miss. 31, 57, 87 So. 464, 465–466 (1921). In 1836, Congress attempted to remedy this oversight by providing for the reservation of lands in lieu of the Sixteenth Section lands and for the vesting of the title to

these lands "in the State of Mississippi, for the use of schools within [the Chickasaw Cession] in said State." 5 Stat. 116. These Chickasaw Cession Lieu Lands, some 174,555 acres, App. 36, were selected and given to the State. In 1856, however, with authority expressly given by Congress, 10 Stat. 6 (1852), the state legislature sold these lands and invested the proceeds, approximately $1,047,330, App. 36, in 8% loans to the State's railroads. 1856 Miss. Laws, ch. 56. These railroads and the State's investment in them, unfortunately, were subsequently destroyed during the Civil War and never replaced.

From these historical circumstances, the current practice in Mississippi with regard to Sixteenth Section lands has evolved directly. Under state law, these lands, which are still apparently held in large part by the State, "constitute property held in trust for the benefit of the public schools and must be treated as such." Miss. Code Ann. § 29–3–1(1) (Supp. 1985). In providing for the operation of these trusts, the legislature has retained the historical tie of these lands to particular townships in terms of both trust administration and beneficiary status. Thus, the State has delegated the management of this property to local school boards throughout the State: Where Sixteenth Section lands lie within a school district or where Lieu Lands were originally appropriated for a township that lies within a school district, the board of education of that district has "control and jurisdiction of said school trust lands and of all funds arising from any disposition thereof heretofore or hereafter made." *Ibid.* In this respect, the board of education is "under the general supervision of the state land commissioner." *Ibid.*[6] Further, the State has, by statute, set forth certain prescriptions for the management of these lands. See generally Miss. Code Ann. §§ 29–3–1 to 29–3–135 (1972 and Supp. 1985). Most im-

---

[6] Pursuant to Miss. Code Ann. § 7–11–4, effective January 1, 1980, the words "state land commissioner" mean "secretary of state." See note following Miss. Code Ann. § 29–3–1 (Supp. 1985).

portant for purposes of this case, however, is Miss. Code Ann. § 29-3-109 (Supp. 1985), which provides:

"All expendable funds derived from sixteenth section or lieu lands shall be credited to the school districts of the township in which such sixteenth section lands may be located, or to which any sixteenth sections lieu lands may belong. Such funds shall not be expended except for the purpose of education of the educable children of the school district to which they belong, or as otherwise may be provided by law."

Consequently, all proceeds from Sixteenth Section and Lieu Lands are allocated directly to the specific township in which these lands are located or to which those lands apply. With respect to the Chickasaw Cession counties, to which no lands now belong, the state legislature has for over 100 years paid "interest" on the lost principal acquired from the sale of those lands in the form of annual appropriations to the Chickasaw Cession schools. Originally, the rate was 8%, but since 1890 the rate has been 6%. See Miss. Const., Art. 8, § 212. The annual amount until 1985 was $62,191. App. 37.

The result of this dual treatment has for many years been a disparity in the level of school funds from Sixteenth Section lands that are available to the Chickasaw Cession schools as compared to the schools in the remainder of the State. In 1984, for example, the legislative appropriation for the Chickasaw Cession resulted in an estimated average per pupil income relative to the Sixteenth Section substitute appropriation of $0.63 per pupil. The average Sixteenth Section income in the rest of the State, in comparison, was estimated to be $75.34 per pupil. *Id.*, at 44.[7] It is this disparity which gave rise to the present action.

---

[7] In 1985, while this case was pending in the Court of Appeals, the state legislature passed a statute providing for increased Sixteenth Section appropriations for the Chickasaw Cession schools. 1985 Miss. Laws, House Bill No. 6, ch. 23. Under this statute, $1 million was to be appropriated for this purpose in 1985, and this amount was to increase by $1 million each

274

In 1981, the petitioners, local school officials and schoolchildren from the Chickasaw Cession, filed suit in the United States District Court for the Northern District of Mississippi against the respondents, an assortment of state officials, challenging the disparity in Sixteenth Section funds. The petitioners' complaint traced the history of public school lands in Mississippi, characterizing as illegal several of the actions that resulted in there being now no Sixteenth Section lands in the Chickasaw Cession area. In particular, the petitioners asserted that the sale of the Chickasaw Cession school lands and unwise investment of the proceeds from that sale in the 1850's had abrogated the State's trust obligation to hold those lands for the benefit of Chickasaw Cession schoolchildren in perpetuity. The result of these actions, said the petitioners, was the disparity between the financial support available to the Chickasaw Cession schools and other schools in the State, which disparity in turn allegedly deprived the Chickasaw Cession schoolchildren of a minimally adequate level of education and of the equal protection of the laws.

Based on these allegations, the petitioners sought various forms of relief for breach of the trust regarding the Chickasaw Cession Sixteenth Section lands and for denial of equal protection.[8] Specifically, the complaint sought a declaration

---

year until it reached a maximum of $5 million for the fiscal year 1989–1990 and thereafter. Even so, the offices of the Mississippi State Auditor and Secretary of State estimated in 1984 that additional funds of over $7 million would be required to bring the Chickasaw Cession funding to the level of the average Sixteenth Section funding in the rest of the State on a per-pupil basis. App. 38.

[8] The complaint also alleged a denial of due process, unconstitutional impairment of contractual obligations, a taking without just compensation, and a Ninth Amendment claim. Of these additional claims, the petitioners press only the contract-clause claim here. Since this claim is in all essential respects the same as the petitioners' trust claim for Eleventh Amendment purposes, our disposition of the trust claim, *infra*, at 276–281, governs this claim as well.

that the state legislation purporting to implement the sale of the Chickasaw Cession school lands was void and unenforceable; the establishment by legislative appropriation or otherwise of a fund in a suitable amount to be held in perpetual trust for the benefit of plaintiffs; or in the alternative making available to plaintiffs Lieu Lands of the same value as the original Chickasaw Cession Sixteenth Section lands.

The District Court dismissed the complaint, holding the claims barred by the applicable statute of limitations and by the Eleventh Amendment to the United States Constitution. The Court of Appeals for the Fifth Circuit affirmed, *Papasan* v. *United States*, 756 F. 2d 1087 (1985), agreeing that the relief requested in the complaint was barred by the Eleventh Amendment. Noting that a federal court should not dismiss a constitutional complaint because it "seeks one remedy rather than another plainly appropriate one," *Holt Civic Club* v. *Tuscaloosa*, 439 U. S. 60, 65 (1978), however, the Court of Appeals deemed the equal protection claim to assert a current, ongoing, and disparate distribution of state funds for the support of local schools, the remedy for which would not be barred by the Eleventh Amendment. Even so, it found dismissal of the complaint to be proper since such differential funding was not unconstitutional under this Court's decision in *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1 (1973).[9]

We granted certiorari, 474 U. S. 1004 (1985), and now vacate the judgment of the Court of Appeals and remand for further proceedings.

---

[9] In their complaint, the petitioners also sought relief from various federal officials, alleging breach of a promise to fund the Chickasaw Cession trust and failure to keep the State of Mississippi from wasting the trust assets. The District Court dismissed these claims as barred by sovereign immunity, laches, and the statutes of limitations. The petitioners' appeal from this dismissal was itself dismissed by joint stipulation. Thus, no issues involving the federal defendants remain in the case.

## II

We first consider whether the Eleventh Amendment bars the petitioners' claims and required dismissal of the complaint.

### A

The Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

This language expressly encompasses only suits brought against a State by citizens of another State, but this Court long ago held that the Amendment bars suits against a State by citizens of that same State as well. See *Hans* v. *Louisiana*, 134 U. S. 1 (1890). "[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 100 (1984).[10] This bar exists whether the relief sought is legal or equitable. *Id.*, at 100–101.

Where the State itself or one of its agencies or departments is not named as defendant and where a state official is named instead, the Eleventh Amendment status of the suit is less straightforward. *Ex parte Young*, 209 U. S. 123 (1908), held that a suit to enjoin as unconstitutional a state official's action was not barred by the Amendment. This holding was based on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity. As the Court explained in *Young* itself:

---

[10] A State may *consent* to be sued in federal court. *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883). Here, however, it is clear that Mississippi has expressly declined such consent. See 1984 Miss. Gen. Laws, ch. 495, § 3(4).

"If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.*, at 159–160.

Thus, the official, although acting in his official capacity, may be sued in federal court. See also *Pennhurst, supra,* at 102, 105; *Hutto* v. *Finney,* 437 U. S. 678, 692 (1978).

*Young,* however, does not insulate from Eleventh Amendment challenge every suit in which a state official is the named defendant. In accordance with its original rationale, *Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal. See *Cory* v. *White,* 457 U. S. 85 (1982). And it does not foreclose an Eleventh Amendment challenge where the official action is asserted to be illegal as a matter of state law alone. See *Pennhurst, supra,* at 104–106. In such a case, federal supremacy is not implicated because the state official is acting contrary to state law only.

We have also described certain types of cases that formally meet the *Young* requirements of a state official acting inconsistently with federal law but that stretch that case too far and would upset the balance of federal and state interests that it embodies. *Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst, supra,* at 105 (quoting *Young, supra,* at 160). Consequently, *Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which fed-

eral law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation. As we have noted: "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green* v. *Mansour*, 474 U. S. 64, 68 (1985) (citation omitted).

Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant.[11] This is true if the relief is expressly denominated as damages. See, *e. g.*, *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459 (1945). It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else. See, *e. g.*, *Green* v. *Mansour*, *supra*, at 69–70; *Edelman* v. *Jordan*, 415 U. S. 651, 664–668 (1974). On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury. See *Milliken* v. *Bradley*, 433 U. S. 267, 289–290 (1977); *Edelman*, *supra*, at 667–668.

For Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct: "[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman*, *supra*, at 667. Compare, *e. g.*, *Quern* v. *Jordan*, 440

---

[11] When a state official is sued and held liable in his *individual* capacity, however, even damages may be awarded. See *Scheuer* v. *Rhodes*, 416 U. S. 232, 237–238 (1974).

U. S. 332 (1979), with *Green* v. *Mansour, supra.* In discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought, see, *e. g., Edelman, supra,* at 668, and will be guided by the policies underlying the decision in *Ex parte Young.*

## B

The petitioners claim that the federal grants of school lands to the State of Mississippi created a perpetual trust, with the State as trustee, for the benefit of the public schools. Relying on *Alamo Land & Cattle Co.* v. *Arizona,* 424 U. S. 295 (1976), and *Lassen* v. *Arizona ex rel. Arizona Highway Dept.,* 385 U. S. 458 (1967), the petitioners contend that "[s]chool lands trusts impose specific burdens and obligations on the states, as well as the state officials who act as trustees, which include preserving the corpus, maximizing income, and, where the corpus is lost or converted wrongfully, continuing the payment of appropriate income indefinitely." Brief for Petitioners 13. The idea that this last obligation exists is gleaned not from any prior judicial construction of school lands grants but instead from alleged federal common-law rules that purportedly govern such trusts. The petitioners rely on this asserted continuing obligation in contending that they seek only a prospective, injunctive remedy, permissible under *Ex parte Young,* requiring state officials to meet that continuing federal obligation by providing the Chickasaw Cession schools with appropriate trust income.

To begin with, it is not at all clear that the school lands grants to Mississippi created a binding trust. The respondents, in fact, contend that the school lands were given to the State in fee simple absolute and that no binding federal obligation was imposed. See *Alabama* v. *Schmidt,* 232 U. S. 168 (1914); *Cooper* v. *Roberts,* 18 How. 173 (1856).[12] But even

---

[12] Even if there was a binding trust, the petitioners point to no authority relating specifically to school lands trusts in support of their contention that the obligation to pay income continues even though the trust corpus has been lost. See Brief for Petitioners 24–28. In addition, even their assertion that such an obligation should be imposed as a matter of common

if the petitioners' legal characterization is accepted, their trust claims are barred by the Eleventh Amendment. The distinction between a continuing obligation on the part of the trustee and an ongoing liability for past breach of trust is essentially a formal distinction of the sort we rejected in *Edelman*. There, the Court of Appeals had upheld an award of "equitable restitution" against the state official, requiring the payment to the plaintiff class of "all AABD benefits wrongfully withheld." 415 U. S., at 656. We found, to the contrary, that the "retroactive award of monetary relief . . . is in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.*, at 668.

The characterization in that case of the legal wrong as the continuing withholding of accrued benefits is very similar to the petitioners' characterization of the legal wrong here as the breach of a continuing obligation to comply with the trust

---

law is unsupported. It may be true that a trust beneficiary is not normally time barred from suing a trustee for breach of trust and loss of the corpus until such time as the trustee expressly repudiates the trust. See, *e. g.*, *Benedict* v. *New York City*, 250 U. S. 321, 327 (1919). But this does not mean that there is a continuing affirmative obligation on the part of the trustee with respect to the trust corpus and income as opposed to merely liability for a past breach of trust that may still be acted upon.

The Restatement, for example, seems to adopt the latter view:

"If a trust is created and the whole of the trust property ceases to exist, the trustee no longer holds anything in trust. In such a case the trustee is under a personal liability to the beneficiary if he committed a breach of trust in causing or allowing the trust property to cease to exist, or if he sold the trust property to himself or lent trust funds to himself, being permitted to do so by the terms of the trust. In such a case if the trustee should be insolvent the beneficiary is not entitled to priority over the general creditors of the trustee. This does not mean, however, that he owes no duties to the beneficiary except the duties which a debtor owes to his creditor, or a tortfeasor to the person he has wronged. He is still in a fiduciary relation to the beneficiary. He cannot properly purchase the interest of the beneficiary without making full disclosure of all circumstances known to him affecting the transaction, and the transaction must be fair, or the beneficiary can set it aside." Restatement (Second) of Trusts § 74, Comment *c*, p. 194 (1959) (citations omitted).

obligations. We discern no substantive difference between a not-yet-extinguished liability for a past breach of trust and the continuing obligation to meet trust responsibilities asserted by the petitioners. In both cases, the trustee is required, because of the past loss of the trust corpus, to use its own resources to take the place of the corpus or the lost income from the corpus. Even if the petitioners here were seeking only the payment of an amount equal to the income from the lost corpus,[13] such payment would be merely a substitute for the return of the trust corpus itself. That is, continuing payment of the income from the lost corpus is essentially equivalent in economic terms to a one-time restoration of the lost corpus itself: It is in substance the award, as continuing income rather than as a lump sum, of "'an *accrued* monetary liability.'" *Milliken* v. *Bradley*, 433 U. S., at 289 (quoting *Edelman*, 415 U. S., at 664). Thus, we hold that the petitioners' trust claim, like the claim we rejected in *Edelman*, may not be sustained.

## C

The Court of Appeals held, however, that the petitioners' equal protection claim was not barred by the Eleventh Amendment. We agree with that ruling. The complaint asserted:

> "By their aforesaid past, present and future deprivations of and to Plaintiffs and the Plaintiff class of the use and benefits of their Sixteenth Section Lands, while at the same time granting to and securing to all other school districts and school children in the State of Mississippi in perpetuity the use and benefit of their Sixteenth Section Lands, the State Defendants have deliberately, intentionally, purposefully, and with design denied to Plaintiffs and the Plaintiff class the equal protection of

---

[13] In fact, the petitioners sought not merely such income but also restoration of the trust corpus and the award of past income not received and interest on that income. App. 28–29.

the laws in violation of their rights secured by the Fourteenth Amendment to the Constitution of the United States." App. 20.

The petitioners also alleged that these same actions denied them "their rights to an interest in a minimally adequate level of education, or reasonable opportunity therefor," *id.*, at 21, while assuring such right to the other schoolchildren in the State. Thus the complaint alleged a present disparity in the distribution of the benefits from the State's Sixteenth Section lands.

This alleged ongoing constitutional violation—the unequal distribution by the State of the benefits of the State's school lands—is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*. It may be that the current disparity results directly from the same actions in the past that are the subject of the petitioners' trust claims, but the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not the past actions of the State. A remedy to eliminate this current disparity, even a remedy that might require the expenditure of state funds, would ensure "'compliance *in the future* with a substantive federal-question determination'" rather than bestow an award for accrued monetary liability. *Milliken, supra,* at 289 (quoting *Edelman, supra,* at 668). This claim is, in fact, in all essential respects the same as the equal protection claim for which relief was approved in *Milliken.* Consequently, we agree with the Court of Appeals that the Eleventh Amendment would not bar relief necessary to correct a current violation of the Equal Protection Clause and that this claim may not properly be dismissed on this basis.[14]

---

[14] The respondents further contend that the petitioners have not sued any state officials who could grant the relief requested, see Brief for Respondents Allain et al. 17–19. We note, however, that the respondent Secretary of State is, by state statute, responsible for "general supervision" of the administration by the local school officials of the Sixteenth

## III

The question remains whether the petitioners' equal protection claim, although not barred by the Eleventh Amendment, is legally insufficient and was properly dismissed for failure to state a claim. See Fed. Rule Civ. Proc. 12(b)(6). We are bound for the purposes of this review to take the well-pleaded factual allegations in the complaint as true. *Miree* v. *DeKalb County*, 433 U. S. 25 (1977); *Kugler* v. *Helfant*, 421 U. S. 117 (1975); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974); *Cruz* v. *Beto*, 405 U. S. 319 (1972); *Gardner* v. *Toilet Goods Assn.*, 387 U. S. 167 (1957). Construing these facts and relevant facts obtained from the public record in the light most favorable to the petitioners, we must ascertain whether they state a claim on which relief could be granted.

### A

In *Rodriguez*, the Court upheld against an equal protection challenge Texas' system of financing its public schools, under which funds for the public schools were derived from two main sources. Approximately half of the funds came from the Texas Minimum Foundation School Program, a state program aimed at guaranteeing a certain level of minimum education for all children in the State. 411 U. S., at 9. Most of the remainder of the funds came from local sources—in particular local property taxes. *Id.*, at 9, n. 21. As a result of this dual funding system, most specifically as a result of differences in amounts collected from local property taxes, "substantial interdistrict disparities in school expenditures [were] found . . . in varying degrees throughout the State." *Id.*, at 15.

In examining the equal protection status of these disparities, the Court declined to apply any heightened scrutiny

---

Section and Lieu Lands. See Miss. Code Ann. § 29–3–1(1) (Supp. 1985). To the extent that the respondent Secretary of State is acting in a manner that violates the Equal Protection Clause, such actions may be enjoined under *Ex parte Young*, 209 U. S. 123 (1908).

based either on wealth as a suspect classification or on education as a fundamental right. As to the latter, the Court recognized the importance of public education but noted that education "is not among the rights afforded explicit protection under our Federal Constitution." *Id.*, at 35. The Court did not, however, foreclose the possibility "that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either [the right to speak or the right to vote]." *Id.*, at 36.[15] Given the absence of such radical denial of educational opportunity, it was concluded that the State's school financing scheme would be constitutional if it bore "some rational relationship to a legitimate state purpose." *Id.*, at 44.

Applying this standard, the dual Texas system was deemed reasonably structured to accommodate two separate forces:

"'[T]he desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children.'

". . . While assuring a basic education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level." *Id.*, at 49 (quoting J. Coleman, Fore-

---

[15] Instead, the Court noted:

"[W]e have no indication that the present levels of educational expenditures in Texas provide an education that falls short [of such a hypothesized constitutional prerequisite]. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimum skills necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U. S., at 36–37.

word to G. Strayer & R. Haig, The Financing of Education in the State of New York vii (1923)).

Given this rational basis, the Court concluded that the mere "happenstance" that the quality of education might vary from district to district because of varying property values within the districts did not render the system "so irrational as to be invidiously discriminatory." 411 U. S., at 55. In particular, the Court found that "any scheme of local taxation— indeed the very existence of identifiable local governmental units—requires the establishment of jurisdictional boundaries that are inevitably arbitrary." *Id.*, at 53–54.

Almost 10 years later, the Court again considered the equal protection status of the administration of the Texas public schools—this time in relation to the State's decision not to expend any state funds on the education of children who were not "legally admitted" to the United States. *Plyler* v. *Doe*, 457 U. S. 202 (1982). The Court did not, however, measurably change the approach articulated in *Rodriguez*. It reiterated that education is not a fundamental right and concluded that undocumented aliens were not a suspect class. 457 U. S., at 223–224. Nevertheless, it concluded that the justifications for the discrimination offered by the State were "wholly insubstantial in light of the costs involved to these children, the State, and the Nation." *Id.*, at 230.

B

The complaint in this case asserted not simply that the petitioners had been denied their right to a minimally adequate education but also that such a right was fundamental and that because that right had been infringed the State's action here should be reviewed under strict scrutiny. App. 20. As *Rodriguez* and *Plyler* indicate, this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review.

Nor does this case require resolution of these issues. Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation. See, *e. g.*, *Briscoe* v. *LaHue*, 663 F. 2d 713, 723 (CA7 1981), aff'd on other grounds, 460 U. S. 325 (1983). See generally 2A J. Moore & J. Lucas, Moore's Federal Practice ¶12.07, p. 12–64, and n. 6 (1985). The petitioners' allegation that, by reason of the funding disparities relating to the Sixteenth Section lands, they have been deprived of a minimally adequate education is just such an allegation. The petitioners do not allege that schoolchildren in the Chickasaw Counties are not taught to read or write; they do not allege that they receive no instruction on even the educational basics; they allege no actual facts in support of their assertion that they have been deprived of a minimally adequate education. As we see it, we are not bound to credit and may disregard the allegation that the petitioners have been denied a minimally adequate education.

Concentrating instead on the disparities in terms of Sixteenth Section lands benefits that the complaint in fact alleged and that are documented in the public record, we are persuaded that the Court of Appeals properly determined that *Rodriguez* dictates the applicable standard of review. The differential treatment alleged here constitutes an equal protection violation only if it is not rationally related to a legitimate state interest.

Applying this test, the Court of Appeals concluded that, historical roots aside, the essence of the petitioners' claim was an attack on Mississippi's system of financing public education. And it reasoned that the inevitability of disparities in income derived from real estate managed and administered locally, as in *Rodriguez*, supplied a rationale for the disparities alleged. To begin with, we disagree with the Court of Appeals' apparent understanding of the crux of the petitioners' claim. As we read their complaint, the petitioners do

not challenge the overall organization of the Mississippi public school financing program. Instead, their challenge is restricted to one aspect of that program: The Sixteenth Section and Lieu Lands funding. All of the allegations in the complaint center around disparities in the distribution of these particular benefits, and no allegations concerning disparities in other public school funding programs are included.

Consequently, this is a very different claim than the claim made in *Rodriguez*. In *Rodriguez*, the contention was that the State's overall system of funding was unconstitutionally discriminatory. There, the Court examined the basic structure of that system and concluded that it was rationally related to a legitimate state purpose. In reaching that conclusion, the Court necessarily found that funding disparities resulting from differences in local taxes were acceptable because related to the state goal of allowing a measure of effective local control over school funding levels. *Rodriguez* did not, however, purport to validate all funding variations that might result from a State's public school funding decisions. It held merely that the variations that resulted from allowing local control over local property tax funding of the public schools were constitutionally permissible in that case.[16]

Here, the petitioners' claim goes neither to the overall funding system nor to the local ad valorem component of that system. Instead, it goes solely to the Sixteenth Section and Lieu Lands portion of the State's public school funding. And, as to this claim, we are unpersuaded that *Rodriguez* resolves the equal protection question in favor of the State. The allegations of the complaint are that the State is distrib-

---

[16] JUSTICE POWELL contends that the fact that the overall system of school financing here is similar to that approved by the Court in *Rodriguez* provides "another reason" to dismiss the petitioners' claims. *Post*, at 301–302, n. 6. *Rodriguez*, however, merely upheld the overall structure of Texas' public school financing and the component of that system allowing for variations in fundings due to local taxation. We do not read *Rodriguez* as validating all disparities that might occur in a system that has an overall structure similar to that approved in that case.

uting the income from Sixteenth Section lands or from Lieu Lands or funds unequally among the school districts, to the detriment of the Chickasaw Cession schools and their students. The Sixteenth Section and Lieu Lands in Mississippi were granted to and held by the State itself. Under state law, these lands "constitute property held in trust for the benefit of the public schools and must be treated as such," Miss. Code Ann. § 29–3–1(1) (Supp. 1985), but in carrying out the trust, the State has vested the management of these lands in the local school boards throughout the State, under the supervision of the Secretary of State, and has credited the income from these lands to the "school districts of the township in which such sixteenth section lands may be located, or to which any sixteenth section lieu lands may belong," such income to be used for the purpose of educating the children of the school district or as otherwise may be provided by law. Miss. Code Ann. § 29–3–109 (Supp. 1985). This case is therefore very different from *Rodriguez*, where the differential financing available to school districts was traceable to school district funds available from local real estate taxation, not to a state decision to divide state resources unequally among school districts. The rationality of the disparity in *Rodriguez*, therefore, which rested on the fact that funding disparities based on differing local wealth were a necessary adjunct of allowing meaningful local control over school funding, does not settle the constitutionality of disparities alleged in this case, and we differ with the Court of Appeals in this respect.[17]

---

[17]JUSTICE POWELL asserts that any discrepancies in Sixteenth Section and Lieu Lands funding cannot be unconstitutional because "the Sixteenth Section payments . . . are an insignificant part of the total payments from all sources made to Mississippi's school districts." *Post*, at 299. Thus, JUSTICE POWELL seems to envision that some sort of threshold level of effect in terms of overall school revenues is necessary before the Equal Protection Clause's strictures become binding. The petitioners, however, have limited themselves to challenging discrimination in the Sixteenth Section and Lieu Lands funding program. This program is in fact separated from other sources of public school funding by the State itself in adminis-

Nevertheless, the question remains whether the variations in the benefits received by school districts from Sixteenth Section or Lieu Lands are, on the allegations in the complaint and as a matter of law, rationally related to a legitimate state interest. We believe, however, that we should not pursue this issue here but should instead remand the case for further proceedings. Neither the Court of Appeals nor the parties have addressed the equal protection issue as we think it is posed by this case: Given that the State has title to assets granted to it by the Federal Government for the use of the State's schools, does the Equal Protection Clause permit it to distribute the benefit of these assets unequally among the school districts as it now does?

A crucial consideration in resolving this issue is whether the federal law requires the State to allocate the economic benefits of school lands to schools in the townships in which those lands are located. If, as a matter of federal law, the State has no choice in the matter, whether the complaint states an equal protection claim depends on whether the federal policy is itself violative of the Clause. If it is, the State may properly be enjoined from implementing such policy. Contrariwise, if the federal law is valid and the State is bound by it, then it provides a rational reason for the funding disparity. Neither the courts below nor the parties have addressed the equal protection issue in these terms.[18] Another

---

tration, see Miss. Code Ann. § 29–3–1 *et seq.* (1972 and Supp. 1985), and for accounting purposes, see, *e. g.*, Mississippi State Department of Education, 1986 Annual Report of the State Superintendent of Public Education 48 (1986). Nor is there any indication that the levels of benefits received from the school lands are in any manner correlated to funds received from other sources. See, *e. g.*, Miss. Code Ann. § 37–19–1 *et seq.* (Supp. 1985). Cf. *post*, at 300–301, n. 5. In this situation, we decline the dissent's invitation to look at school receipts overall. We also decline to append to the general requirements of an equal protection cause of action an additional threshold effects requirement.

[18] As to this question, we make only the following observations. The starting point of any consideration of this question must be the federal

possible consideration in resolving the equal protection issue
is that school lands require management and that the State
has assigned this task to the individual districts in which the

grants themselves, for it is clear that the interest transferred to the State
depends on the federal laws that transferred that interest. See *California
ex rel. State Lands Comm'n v. United States*, 457 U. S. 273, 279 (1982)
(citing *Borax Consolidated, Ltd. v. Los Angeles*, 296 U. S. 10, 22 (1935)).
If the federal law provided for the transfer of an absolute fee interest, the
lands are owned outright by the State. On the other hand, if the federal
law created a trust with the State as trustee, the State is bound to comply
with the terms of that trust.

Each of these possible conclusions finds some support in this Court's
prior cases. In *Cooper v. Roberts*, 18 How. 173, 181–182 (1856), for exam-
ple, the Court approved the sale of school lands granted to the State of
Michigan even where Congress had not expressly authorized such a sale,
stating that "the grant is to the State directly, without limitation of its
power, though there is a sacred obligation imposed on its public faith."
The Court adopted this same reasoning in *Alabama v. Schmidt*, 232 U. S.
168 (1914), in which the Court approved the application of Alabama's ad-
verse possession laws to school lands against an argument that the State's
interest could not be extinguished in that manner under the terms of the
grant and that when the lands were no longer used for the support of the
schools title would revert to the United States. Relying on *Cooper*, the
Court concluded that "[t]he gift to the State is absolute, although, no
doubt, as said in *Cooper*, 'there is a sacred obligation imposed on its public
faith.' But that obligation is honorary . . . ." 232 U. S., at 173–174
(citations omitted). See also *Stuart v. Easton*, 170 U. S. 383, 394 (1898)
(cited by the Court in *Schmidt, supra*, at 174) (" 'the mere expression of a
purpose will not of and by itself debase a fee' ") (quoting *Kerlin v. Camp-
bell*, 15 Pa. St. 500 (1850)). Thus, the Court's interpretations of some of
the earlier grants conceived of those grants as conveying a fee interest to
the States. See also *Brooks v. Koonce*, 275 U. S. 486 (1927) *(per curiam)*,
aff'g *Sloan v. Blytheville Special School Dist. No. 5*, 169 Ark. 77, 273
S. W. 397 (1925) (relying on *Cooper* and *Schmidt* to dismiss challenge by
local school board to use of proceeds from local Sixteenth Section lands for
the benefit of the State at large).

On the other hand, cases interpreting more recent grants have found an
explicit trust obligation, although it is worth noting that none of these
grants included a provision similar to that at issue here; they provided for
lands for the general benefit of the schools in the State. However, in
*Ervien v. United States*, 251 U. S. 41 (1919), for example, the Court up-

lands are located, subject to supervision by the State. The significance, if any, in equal protection terms of this allocation of duties in justifying assigning the income exclusively to those who perform the management function and none of it to

held a lower court decision enjoining as a breach of trust any use by the New Mexico Public Lands Commissioner of Sixteenth Section proceeds for a purpose other than one of the purposes enumerated in the grant. Thus, the Court held that under these circumstances the phrase "breach of trust" meant "that the United States, being the grantor of the lands, could impose conditions upon their use, and have the right to exact the performance of the conditions." *Id.*, at 48. More recently, the Court in *Lassen* v. *Arizona ex rel. Arizona Highway Dept.*, 385 U. S. 458, 460–461 (1967), interpreted and enforced the terms of the Arizona school lands grant, noting that "[t]he grant involved here . . . expressly requires the Attorney General of the United States to maintain whatever proceedings may be necessary to enforce its terms." See also *Alamo Land & Cattle Co.* v. *Arizona*, 424 U. S. 295 (1976).

Thus, the Court has indicated that some school lands grants did not create express trusts and has held that other grants did create such trusts, although it has never enforced a provision such as the provision at issue here. The Court has never discussed the relationship between these two sets of cases, but it is possible that any variation in results stems from the facts that the terms of the grants have varied over time. See *Lassen, supra,* at 460. Thus, it could be that the earlier grants did give the grantee States absolute fee interests, while the later grants created actual enforceable trusts. On the other hand, it may be that the petitioners are correct in asserting that the substance of all of these grants is the same. See S. Rep. No. 454, 61st Cong., 2d Sess., 18–20 (1910) (referring to express trust provisions in New Mexico and Arizona Enabling Act as "nothing new in principle," and noting that "[f]or many years it has been the custom to specify the purposes for which grants of lands are made to incoming states and to place express restrictions upon the mode of disposing of them"). Or perhaps they are all properly viewed as being in the nature of "a 'solemn agreement' which in some ways may be analogized to a contract between private parties." *Andrus* v. *Utah*, 446 U. S., at 507. Perhaps, then, the conditions of the grants are still enforceable by the United States, although possibly not by third parties. This may be the case even though the federal defendants disavowed this position below, arguing that *Cooper* and *Schmidt* control and that our recent cases are distinguishable because they involve express trusts. See, e. g., Reply Brief for Federal Defendants in No. 81–90 (ND Miss.), pp. 60–62.

those districts that have no lands to manage is a matter that is best addressed by the lower courts in the first instance.

Accordingly, the judgment of the Court of Appeals is affirmed insofar as it affirmed the dismissal of petitioners' breach of trust and related claims. With respect to the affirmance of the District Court's dismissal of the equal protection claim, the judgment of the Court of Appeals is vacated, and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part, concurring in the judgment in part, and dissenting in part.

Although I join Parts I and III of the Court's opinion and agree with the result in Part II–C, I do not join Parts II–A and II–B for the reasons stated in my dissent in *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 258–302 (1985) (BRENNAN, J., dissenting).

The Court makes a valiant effort to set forth the principles that determine whether a particular claim is or is not barred by the Eleventh Amendment. See *ante,* at 276–279. To my mind, the Court's restatement simply underscores the implausibility of the entire venture, for it clearly demonstrates that the Court's Eleventh Amendment jurisprudence consists of little more than a number of ad hoc and unmanageable rules bearing little or no relation to one another or to any coherent framework; indeed, the Court's best efforts to impose order on the cases in this area has produced only the conclusion that "[f]or Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct," *ante,* at 278. This hodgepodge produces no positive benefits to society. Its only effect is to impair or prevent effective enforcement of federal law. It is highly unlikely that, having created a system in which federal law was to be supreme, the Framers of the Constitution or of the Elev-

enth Amendment nonetheless intended for that law to be unenforceable in the broad class of cases now barred by this Court's precedents. In fact, as I demonstrated last Term in *Atascadero*, the Framers intended no such thing.

The magnitude of the Court's mistake has only been increased by changes that have taken place in our law and our society since *Hans* v. *Louisiana*, 134 U. S. 1 (1890), took the first step down this ill-advised path, for the National Government and federal law play a much more important role in protecting the rights of individuals today. Only *stare decisis* can support the Court's continued adherence to this unfortunate doctrine. *Stare decisis* is indeed a force to be reckoned with—although the Court has not felt itself particularly constrained by *stare decisis* in *expanding* the protective mantle of sovereign immunity, see *Pennhurst State School & Hospital* v. *Halderman*, 465 U. S. 89, 165–166, n. 50 (1984) (STEVENS, J., dissenting); *Atascadero State Hospital* v. *Scanlon, supra*, at 304 (STEVENS, J., dissenting). However, as Chief Justice Taney observed, the authority of the Court's construction of the Constitution ultimately "depend[s] altogether on the force of the reasoning by which it is supported." *Passenger Cases*, 7 How. 283, 470 (1849) (dissenting opinion). The Court's Eleventh Amendment jurisprudence is not supported by history or by sound legal reasoning; it is simply bad law. In matters of such great institutional importance as this, *stare decisis* must yield.

JUSTICE BLACKMUN, concurring in part and dissenting in part.

The Court today holds that petitioners' breach of trust claims are barred by the Eleventh Amendment. I cannot agree. Petitioners claim that Mississippi breached legal obligations placed on it by federal law. I agree with JUSTICE BRENNAN that the Eleventh Amendment was never intended to bar such suits. *Ante*, at 292–293 (BRENNAN, J., concurring in part, concurring in judgment in part, and dissenting in part). But even if the Eleventh Amendment normally would

bar suits against a State by its citizens, I believe that, when a State willingly accepts a substantial benefit from the Federal Government, it waives its immunity under the Eleventh Amendment and consents to suit by the intended beneficiaries of that federal assistance. See, *e. g.*, *Green* v. *Mansour*, 474 U. S. 64, 81 (1985) (BLACKMUN, J., dissenting); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 304 (1985) (BLACKMUN, J., dissenting); *Edelman* v. *Jordan*, 415 U. S. 651, 688–696 (1974) (MARSHALL, J., dissenting).

The very Enabling Act that gave Mississippi the benefits of statehood, including the protections afforded by the Eleventh Amendment, expressly incorporated the Northwest Ordinance of 1789, which required the reservation of Sixteenth-Section lands for the benefit of public education. See Act of Mar. 1, 1817, 3 Stat. 348, 349. And the Act giving Mississippi the Chickasaw Cession Lieu Lands expressly provided that those lands be held "upon the same terms and conditions, in all respects, as the said State now holds the lands heretofore reserved for the use of schools in said State." Act of July 4, 1836, § 2, 5 Stat. 116.

Neither the District Court nor the Court of Appeals addressed the nature of the conditions the Federal Government placed upon Mississippi's use of the Lieu Lands. But, as the Court notes in discussing petitioners' equal protection claims, the Federal Government may have intended to bind Mississippi to use the lands solely to benefit the schoolchildren of the particular township to which the school lands were originally attached. *Ante*, at 287–289, and n. 16. Moreover, Mississippi apparently has concluded, as a matter of state law, that school lands "constitute property held in trust for the benefit of the public schools and must be treated as such." Miss. Code Ann. § 29–3–1(1) (Supp. 1985). Thus, a fuller consideration of the actual terms on which the Federal Government conveyed the Lieu Lands to Mississippi might reveal that the State waived its immunity from suit.

Absent an Eleventh Amendment bar, the complaint should survive a motion to dismiss. Petitioners have made several allegations which, read fairly, suggest that Mississippi did not use the Lieu Lands solely for the benefit of Chickasaw Cession schoolchildren. They claim that the State leased the Lieu Lands for a minimal sum, converted the leaseholds into outright ownership without the payment of additional consideration, invested the entire proceeds generated by disposition of the Lieu Lands in railroad stock, and then decided to pay only 6% interest on the hypothetical fund created to replace the lost Lieu Lands proceeds. I believe these assertions, which must be taken as true at this stage in the proceedings, sufficiently articulate a claim that the state legislature acted to aid the interests of land speculators, railroads, and the economic development of the entire State at the expense of the Chickasaw Cession children, in violation of its trust obligation.

If the Federal Government intended to impress a trust upon the Lieu Lands with the State as trustee and the Chickasaw Cession schoolchildren as the beneficiaries, those children should have a right of action against the State for breach of its fiduciary duty. As the Court recognizes, damages are the proper remedy for a breach of fiduciary duty when the corpus of a trust has been entirely lost. See *ante*, at 280–281. Thus, for the reasons expressed by JUSTICE MARSHALL in *Edelman* v. *Jordan*, 415 U. S., at 691–692, I believe that petitioners would be entitled to damages if they proved at trial the breach of trust they have alleged. I therefore would reverse the Court of Appeals' dismissal of petitioners' trust-based claims and remand this issue for fuller consideration.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part and dissenting in part.

The public record refutes petitioners' equal protection claims that the disparities in funding from various school lands detrimentally affects students and schools in school dis-

tricts within the Chickasaw Cession. Statistics from Mississippi's State Department of Education show the statewide ranking of school districts in terms of expenditures per pupil. In this ranking, the Chickasaw Cession districts are scattered widely among the State's 154 school districts. Moreover, far from being a "critical element of school funding in Mississippi," as alleged by petitioners, the Sixteenth Section lands account for only 1½% of overall funds provided for schools.[1] I therefore find no basis for the assumption that petitioners can prove that students in Chickasaw Cession districts have been detrimentally affected by this differential, and I do not believe that petitioners have asserted an equal protection claim that can survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[2]

# I

A brief procedural history is helpful in putting this litigation in perspective. Petitioners include a group of county school boards, superintendents of education, and individual schoolchildren, all residing in the Chickasaw Cession counties in north Mississippi. In June 1981, petitioners sued numerous federal and state officials, attacking the difference between, on the one hand, payments from Sixteenth Section lands in other school districts (the Chocktaw area) and, on the other hand, payments from the State of Mississippi's trust fund to school districts within the Chickasaw Cession in place of income from the Chickasaw school lands.

The complaint recounted alleged "illegalities" as far back as the Northwest Territory Ordinance of 1785. It sought to have various federal statutes that "purport to authorize, validate or confirm" sales of the Sixteenth Section lands declared

---

[1] Mississippi State Department of Education, 1986 Annual Report of the State Superintendent of Public Education (1986). Tables A and B, *infra*, are taken from this Report, pp. 144–146 and 48, respectively.

[2] I agree with the Court that most of petitioners' claims are barred by the Eleventh Amendment, and therefore join Part II of the Court's opinion.

"unlawful, void and unenforceable, including but not limited to (a) the Act of July 4, 1936; (b) the Act of May 19, 1852; (c) the Act of March 3, 1857; (d) any other acts of Congress having said effect." App. 16 (citations omitted).

The complaint also alleged that both the federal and state defendants had breached perpetual and binding obligations of "an express/constructive trust": the federal defendants by permitting the State to breach the trust through various statutes (*e. g.*, the Northwest Territory Ordinance), and the state defendants by unlawfully selling the relevant properties and by ill-advisedly investing the proceeds of that sale. The complaint further alleged violations of due process by denial of "free appropriate public education" and—of relevance to the case as it stands before this Court—violations of equal protection by disparate distribution of certain funds and by infringement upon the "fundamental rights" of "a suspect class" to "a minimally adequate level of education." Finally, the complaint alleged impairment of obligation of contract and taking without just compensation.

Petitioners sought wide-ranging relief, including conveyance to them of properties or money of a value equivalent to that of the relevant school lands and compensation for the income from 1832 to present that petitioners "would have received . . . if such lands had been subjected to such prudent use and reasonable management." Petitioners also sought to obtain new lands as substitution for those lost, "which may include offshore oil, gas and other mineral rights." Petitioners additionally sought to "enjoin" and "direct" the defendants to establish "a fund or funds of such value" as was necessary to provide "hereafter" and "in perpetuity" annual income to Chickasaw Cession school districts. Finally, petitioners demanded that the defendants take other steps to "eliminate and compensate and for the future guarantee and protect Plaintiffs and the Plaintiff class against . . . denials

and deprivations of their rights to due process of law and to the equal protection of the laws."[3]

The District Court held that the claims against the Federal Government were barred by sovereign immunity, laches, and statutes of limitations. This order was not appealed. In a separate order, the District Court held that any monetary remedy was barred by the Eleventh Amendment—a holding affirmed by the Court of Appeals and by this Court today. I agree with this disposition. I also would not reach the issues raised by allegations of the denial of a "fundamental right" to "a minimally adequate education." See *ante*, at 285. I do not, however, agree with the Court's holding that petitioners' equal protection allegations regarding the disparate distribution of funds present a claim of sufficient substance to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## II

The Court begins the discussion of petitioners' equal protection claim, *ante*, at 283–292, by acknowledging that it is appropriate for the Court to take notice of "relevant facts obtained from the public record in the light most favorable to the petitioners." *Ante*, at 283. The most recent figures available

---

[3] One rarely sees a complaint that is as sweeping in its allegations and as duplicative in its requests for relief. Apparently, no question was raised by respondents or the District Court as to whether in signing this complaint, counsel for petitioners complied with Rule 11 of the Federal Rules of Civil Procedure. That Rule reads in pertinent part: "The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper, that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

Despite the wide-ranging complaint, the *only* alleged denial of equal protection is with respect to the funding in the Chickasaw Cession school districts. As noted *supra*, at 296, these funds are only 1½% of overall funding for elementary and secondary schools within the State.

from the State Department of Education of Mississippi, read in such a light, fatally undercut petitioners' equal protection claims.

It is alleged—and here accepted as true—that there is a disparity between the payments from the Sixteenth Section lands in the Chocktaw districts and the payments from the State of Mississippi's trust fund to Chickasaw districts.[4] The complaint characterizes this disparity as an "unjust, inequitable and unconstitutional deprivation of the rights of the children of the Chickasaw Cession counties." App. 2. The Court reads the complaint as alleging that this unequal distribution of such funds acts "to the detriment of the Chickasaw Cession schools and their students," *ante,* at 288. The complaint, however, contains no factual assertions other than this disparity to support these conclusory allegations, nor is there any basis for believing a detriment could ever be proved. As shown in Table A, the various per pupil expenditures in petitioners' school districts are comparable to, and in some cases higher than, the average for districts within the Chocktaw area. And the Sixteenth Section payments—as the figures in Table B demonstrate beyond argument—are an insignificant part of the total payments from all sources made to Mississippi's school districts.

The Court does not question these data. It instead states that petitioners "have limited themselves to challenging discrimination in the Sixteenth Section" program, and, relying on that limitation, "decline[s] the dissent's invitation to look at school receipts overall." *Ante,* at 288–289, n. 17. The Court thereby ignores the undisputed facts concerning the

---

[4] The Court states that this disparity is $75.34 *versus* $0.63. The Court of Appeals and the petition for certiorari give the relevant figures as $31.25 and $0.80. *Papasan* v. *United States,* 756 F. 2d, 1087, 1091 (CA5 1985); Pet. for Cert. 4. The former figures are derived from an unaudited aggregation of reports by individual school districts presented in a November 1984 report on the Chickasaw Cession districts from the State Auditor and the Secretary of State. App. 35. As this case arose from a Rule 12(b)(6) motion, I use the disparity most favorable to the plaintiffs: $74.71.

funding of public education in the State of Mississippi, and instead bases its equal protection analysis on 1½% of the overall funds provided for public secondary and elementary schools in the State. The Equal Protection Clause, at least in the context of a state funding of schools, is concerned with *substance*, not with the *de minimis* variations of funding among the districts.

Table A in the Appendix to this opinion, "School Finances," shows that Chickasaw Cession school districts are in fact distributed throughout a financial ranking of all the State's school districts, whether the measure used is "Current Expenditure per Pupil," "Current Expenditure per Pupil for Instruction Cost," or "Current Expenditure per Pupil . . . Less Transportation." Specifically, the Table shows that the statewide average per pupil expenditure was $1965.78, of which $1,261.09 went towards "instructional cost." All but 6 of the 39 school districts within the Chickasaw Cession districts spent within $300 of the per pupil average expenditure; all but two spent within $200 of the average per pupil instructional expenditure. The per pupil expenditure was over $1,400 in the Chickasaw district with the lowest per pupil expenditure, and over $2,400 in the Chickasaw district with the highest expenditure. In the light of these figures of expenditures per pupil, I cannot believe that $74.71—the alleged difference between the average per pupil payment from Sixteenth Section lands and the average per pupil payment from the State's trust fund in place of the Chickasaw school lands—creates a "detriment" to the students and schools within the Chickasaw Cession and thereby gives rise to a violation of equal protection under the rational-relation standard.[5]

---

[5] The State distributes its funds equally throughout Mississippi's school districts on the basis of "teacher unit[s]." See Miss. Code Ann. §§ 37–19–3 and 37–19–5 (Supp. 1985); Tr. Oral Arg. 32. As in many States, total funding among districts in Mississippi varies depending upon local ad valorem taxes and other district sources. See Table B; see also *San Antonio*

Although the figures of expenditures per pupil are fatal to petitioners' claims, a second set of statistics provides an additional reason to conclude that an equal protection claim concerning alleged disparities in Sixteenth Section lands should not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). As shown in Table B, "Receipts for Public Schools," payments received from Sixteenth Section lands in 1984–1985, $16,272,925, accounted for less than 1½% of total "Receipts for Public Schools" throughout the State. These Sixteenth Section payments are dwarfed by income from state and federal funds of over $752 million (totaling 74% of "Receipts for Public Schools"). Variations among school districts of such a small part of the total receipts cannot support a claim of a violation of the Equal Protection Clause in the provision of education for the children of the Chickasaw Cession districts.[6]

---

*Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 49 (1973). Discrepancies from Sixteenth Section lands are frequently offset in part or entirely by ad valorem taxes, and the variations in local funding from sources other than Sixteenth Section lands are almost always greater than the alleged "disparity" relied on in this case. See Annual Report, *supra* n. 1, at 94–98 (listing revenue receipts by local sources).

[6] There is another reason to dismiss petitioner's claims. The system of financing Mississippi's public schools bears a substantial similarity to the financing arrangement in the State of Texas upheld by this Court. *San Antonio Independent School Dist.* v. *Rodriguez, supra.* In *Rodriguez,* almost half of the revenues for funding elementary and secondary schools came from a large state-funded program designed to provide a basic minimal education in every school. Each school district then would supplement state and federal funds through an ad valorem tax on property within its jurisdiction. Similarly, Mississippi provides each district with funds to support a "minimum program of education." See Miss. Code Ann. § 37–19–1 *et seq.* (1972 and Supp. 1985). These funds constitute over half of the receipts for public schools; federal funds constitute another 18%. Of the remaining receipts for Mississippi's school districts, ad valorem taxes, which are levied by, and vary among, the local school districts, account for over two-thirds. See Table B, *infra.* Mississippi's financing system, like that of Texas, "[w]hile assuring a basic education for every child in the State, . . . permits and encourages a large measure of participation and

### III

Petitioners' equal protection claims cannot survive a motion under Federal Rule Civil Procedure 12(b)(6) in the light of the distribution of Chickasaw Cession districts throughout the statewide rankings of various expenditures per pupil and the insignificance of the Sixteenth Section funds relative to the total receipts for education. Accordingly, I dissent.

---

control of each district's schools at the local level." *Rodriguez, supra,* at 49.

I also note that Mississippi has taken numerous steps to ensure the adequacy of the most important single factor in education: the quality of the teachers. The State has established a Commission on Teacher and Administrator Education to oversee the training, certification, and evaluation of public school teachers throughout Mississippi. Miss. Code Ann. § 37-3-2 (Supp. 1985). There is a guaranteed minimum for teachers' salaries that may be augmented by the local districts, §§ 37-19-7 and 37-19-15, a scale of pay increases based on tenure and merit, § 37-19-7, a guarantee of no reduction in any local supplements to salary, § 37-19-11, a set of minimum standards for teachers' competency, § 37-19-9, and a requirement that all teachers employed after July 1, 1975, take the "national teachers examination," § 37-19-13.

# APPENDIX TO OPINION OF POWELL, J.
## TABLE A
### SCHOOL FINANCES†

| District | Average Current Expenditure per Pupil in ADA (1984–1985) | | Average Current Expenditure per Pupil for Instruction Cost in ADA (1984–1985) | | Average Current Expenditure per Pupil in ADA Less Transportation (1984–1985) | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| Natchez Adams | 2,131.22 | 33 | 1,253.67 | 73 | 2,018.70 | 31 |
| *Alcorn* | *1,694.89* | *132* | *1,270.49* | *63* | *1,585.03* | *129* |
| Corinth | 1,947.49 | 64 | 1,274.92 | 61 | 1,862.16 | 53 |
| Amite | 2,331.43 | 11 | 1,454.17 | 18 | 2,057.52 | 28 |
| Attala | 2,109.59 | 36 | 1,298.66 | 48 | 1,936.06 | 40 |
| Kosciusko | 1,877.64 | 88 | 1,104.12 | 139 | 1,727.96 | 90 |
| *Benton* | *2,121.78* | *35* | *1,338.89* | *38* | *1,952.98* | *38* |
| Bolivar #1 | * 2,082.64 | 39 | 1,339.85 | 36 | 2,012.20 | 34 |
| Bolivar #2 | * 2,769.62 | 4 | 1,804.24 | 2 | 2,699.23 | 3 |
| Bolivar #3 | * 1,943.55 | 66 | 1,264.60 | 68 | 1,873.11 | 51 |
| Bolivar #4 | * 1,793.43 | 110 | 1,182.67 | 106 | 1,722.98 | 91 |
| Bolivar #5 | * 2,027.20 | 45 | 1,309.88 | 45 | 1,956.74 | 37 |
| Bolivar #6 | * 1,657.08 | 136 | 1,173.85 | 116 | 1,586.61 | 128 |
| *Calhoun* | *1,770.32* | *115* | *1,199.18* | *95* | *1,656.17* | *111* |
| Carroll | 2,014.44 | 51 | 1,295.68 | 49 | 1,821.73 | 69 |
| *Chickasaw* | *2,158.73* | *29* | *1,438.50* | *21* | *1,901.76* | *47* |
| *Houston* | *1,797.93* | *108* | *1,233.84* | *80* | *1,681.46* | *105* |
| *Okolona* | *1,635.52* | *143* | *1,106.77* | *137* | *1,565.18* | *132* |
| Choctaw | 1,935.99 | 70 | 1,309.67 | 46 | 1,787.92 | 77 |
| Claiborne | 4,085.75 | 1 | 2,066.37 | 1 | 3,799.88 | 1 |
| Enterprise | * 1,729.02 | 123 | 1,143.75 | 128 | 1,538.66 | 136 |
| Quitman Cons. | * 1,813.05 | 106 | 1,129.16 | 133 | 1,622.30 | 120 |
| *Clay* | *2,307.56* | *13* | *1,482.73* | *13* | *2,161.68* | *13* |
| West Point | 1,844.88 | 97 | 1,198.97 | 96 | 1,733.96 | 89 |
| *Coahoma Cty.* | *2,414.77* | *10* | *1,514.98* | *6* | *2,236.92* | *10* |
| *Clarksdale* | *1,918.05* | *77* | *1,255.92* | *72* | *1,891.53* | *49* |
| Copiah | 2,168.89 | 28 | 1,162.03 | 122 | 2,064.60 | 25 |
| Hazlehurst | 1,771.68 | 114 | 1,190.21 | 99 | 1,660.59 | 110 |
| Covington | 1,912.97 | 79 | 1,290.85 | 50 | 1,782.63 | 79 |
| *Desoto* | *1,565.04* | *148* | *1,021.31* | *150* | *1,467.48* | *146* |

| District | Average Current Expenditure per Pupil in ADA (1984–1985) | | Average Current Expenditure per Pupil for Instruction Cost in ADA (1984–1985) | | Average Current Expenditure per Pupil in ADA Less Transportation (1984–1985) | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| Forrest | 2,019.63 | 48 | 1,352.53 | 34 | 1,841.33 | 60 |
| Hattiesburg | 2,215.47 | 25 | 1,465.32 | 15 | 2,145.72 | 14 |
| Petal | 1,701.54 | 129 | 1,182.13 | 108 | 1,595.90 | 124 |
| Franklin | 2,298.67 | 15 | 1,514.75 | 7 | 2,121.11 | 21 |
| George | 1,474.78 | 153 | 982.08 | 152 | 1,341.92 | 154 |
| Greene | 2,056.05 | 42 | 1,278.69 | 58 | 1,834.67 | 65 |
| Grenada | 1,764.73 | 116 | 1,175.11 | 114 | 1,644.66 | 114 |
| Hancock | 1,750.66 | 119 | 1,011.95 | 151 | 1,566.13 | 131 |
| Bay St. Louis | 1,981.82 | 56 | 1,165.33 | 119 | 1,905.05 | 46 |
| Harrison | 1,860.89 | 92 | 1,264.10 | 69 | 1,758.84 | 83 |
| Biloxi | 2,251.56 | 18 | 1,411.45 | 24 | 2,163.00 | 12 |
| Gulfport | 2,496.19 | 8 | 1,457.45 | 17 | 2,433.81 | 7 |
| Long Beach | 1,920.58 | 74 | 1,257.30 | 71 | 1,843.01 | 59 |
| Pass Christian | 2,965.97 | 2 | 1,628.06 | 3 | 2,874.13 | 2 |
| Hinds | 1,918.64 | 76 | 1,215.27 | 87 | 1,796.81 | 73 |
| Jackson | 2,429.77 | 9 | 1,422.73 | 22 | 2,293.98 | 9 |
| Clinton | 1,813.93 | 105 | 1,178.70 | 110 | 1,702.73 | 101 |
| Holmes | 1,854.79 | 95 | 1,223.53 | 85 | 1,713.49 | 94 |
| Durant | 1,553.46 | 151 | 1,155.74 | 125 | 1,553.37 | 133 |
| Humphreys | 2,132.20 | 32 | 1,193.35 | 97 | 1,959.88 | 36 |
| *Itawamba* | *1,905.92* | *80* | *1,156.48* | *124* | *1,749.66* | *85* |
| Jackson | 2,243.31 | 20 | 1,364.81 | 33 | 2,113.99 | 23 |
| Moss Point | 1,878.90 | 87 | 1,249.54 | 75 | 1,796.95 | 71 |
| Ocean Springs | 1,920.67 | 73 | 1,269.80 | 64 | 1,852.01 | 58 |
| Pascagoula | 2,538.68 | 6 | 1,494.00 | 11 | 2,458.17 | 5 |
| East Jasper | * 2,010.43 | 52 | 1,265.89 | 66 | 1,836.99 | 64 |
| West Jasper | * 1,866.24 | 89 | 1,244.61 | 79 | 1,693.61 | 103 |
| Jefferson | 2,066.22 | 41 | 1,351.06 | 35 | 1,861.66 | 54 |
| Jefferson Davis | 1,928.49 | 72 | 1,275.72 | 60 | 1,749.29 | 86 |
| Jones | 1,719.42 | 125 | 1,170.06 | 117 | 1,551.87 | 134 |
| Laurel | 2,639.67 | 5 | 1,590.71 | 4 | 2,581.89 | 4 |
| Kemper | 2,096.15 | 38 | 1,339.34 | 37 | 1,868.72 | 52 |
| *Lafayette* | *1,698.47* | *130* | *1,109.42* | *136* | *1,530.26* | *137* |
| *Oxford* | *2,226.94* | *24* | *1,514.00* | *8* | *2,118.55* | *22* |

| District | Average Current Expenditure per Pupil in ADA (1984–1985) | | Average Current Expenditure per Pupil for Instruction Cost in ADA (1984–1985) | | Average Current Expenditure per Pupil in ADA Less Transportation (1984–1985) | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| Lamar | 1,506.98 | 152 | 971.37 | 153 | 1,382.92 | 153 |
| Lumberton Line | * 1,601.57 | 145 | 1,182.43 | 107 | 1,601.07 | 122 |
| Lauderdale | 1,641.60 | 138 | 1,084.88 | 143 | 1,485.10 | 143 |
| Meridian | 2,136.57 | 31 | 1,398.45 | 26 | 2,064.38 | 26 |
| Lawrence | 1,980.57 | 57 | 1,193.35 | 98 | 1,840.85 | 62 |
| Leake | 1,720.38 | 124 | 1,132.06 | 132 | 1,574.13 | 130 |
| *Lee* | *1,694.48* | *133* | *1,162.81* | *120* | *1,587.20* | *127* |
| *Nettleton Line* | * *1,457.55* | *154* | *1,097.67* | *141* | *1,444.60* | *149* |
| Tupelo | 2,199.64 | 27 | 1,337.87 | 39 | 2,137.07 | 16 |
| Leflore | 2,148.73 | 30 | 1,384.79 | 29 | 2,022.71 | 30 |
| Greenwood | 2,245.93 | 19 | 1,459.97 | 16 | 2,215.51 | 11 |
| Lincoln | 1,590.44 | 146 | 1,076.05 | 145 | 1,441.20 | 150 |
| Brookhaven | 2,031.92 | 44 | 1,416.07 | 23 | 1,920.57 | 43 |
| Lowndes | 1,640.09 | 140 | 1,060.41 | 147 | 1,517.19 | 140 |
| Columbus | 2,106.33 | 37 | 1,383.49 | 30 | 2,018.05 | 33 |
| Madison | 2,125.62 | 34 | 1,301.47 | 47 | 1,912.65 | 45 |
| Canton | 1,697.55 | 131 | 1,213.84 | 90 | 1,639.48 | 117 |
| Ridgeland | 1,814.86 | 103 | 1,150.59 | 127 | 1,704.57 | 100 |
| Marion | 2,272.92 | 16 | 1,494.76 | 10 | 2,061.49 | 27 |
| Columbia | 2,240.43 | 23 | 1,448.23 | 19 | 2,132.43 | 18 |
| *Marshall* | *1,684.23* | *134* | *1,201.21* | *94* | *1,524.60* | *139* |
| *Holly Springs* | *1,975.64* | *59* | *1,232.12* | *82* | *1,860.84* | *55* |
| *Monroe* | *1,706.16* | *127* | *1,112.07* | *135* | *1,546.87* | *135* |
| *Aberdeen* | *1,890.98* | *83* | *1,245.80* | *78* | *1,796.93* | *72* |
| *Amory* | *1,840.11* | *98* | *1,283.43* | *53* | *1,764.71* | *81* |
| Montgomery | 2,022.40 | 47 | 1,213.96 | 89 | 1,856.00 | 57 |
| Winona | 2,005.07 | 53 | 1,401.42 | 25 | 1,945.24 | 39 |
| Neshoba | 1,638.19 | 141 | 1,162.39 | 121 | 1,502.41 | 141 |
| Philadelphia | 1,913.78 | 78 | 1,319.95 | 42 | 1,832.34 | 67 |
| Newton | 1,920.07 | 75 | 1,185.90 | 105 | 1,719.76 | 93 |
| Newton Sep. | 1,945.74 | 65 | 1,249.46 | 76 | 1,831.42 | 68 |
| Union Sep. | 1,740.87 | 121 | 1,143.63 | 129 | 1,646.80 | 113 |
| Noxubee | 1,939.99 | 69 | 1,289.94 | 51 | 1,749.23 | 87 |
| Oktibbeha | 1,897.03 | 82 | 1,337.68 | 40 | 1,759.97 | 82 |

| District | Average Current Expenditure per Pupil in ADA (1984–1985) | | Average Current Expenditure per Pupil for Instruction Cost in ADA (1984–1985) | | Average Current Expenditure per Pupil in ADA Less Transportation (1984–1985) | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| Starkville | 1,965.92 | 62 | 1,252.02 | 74 | 1,879.25 | 50 |
| *North Panola* | * 1,864.61 | 90 | 1,215.43 | 86 | 1,705.72 | 99 |
| *South Panola* | * 1,637.45 | 142 | 1,100.87 | 140 | 1,478.59 | 145 |
| Pearl River | 1,562.46 | 149 | 966.38 | 154 | 1,418.22 | 152 |
| Picayune | 1,752.85 | 118 | 1,190.01 | 101 | 1,672.13 | 106 |
| Poplarville | 1,862.97 | 91 | 1,190.15 | 100 | 1,707.74 | 96 |
| Perry | 2,311.91 | 12 | 1,371.84 | 31 | 2,111.50 | 24 |
| Richton | 1,886.43 | 85 | 1,174.43 | 115 | 1,719.79 | 92 |
| North Pike | * 1,630.22 | 144 | 1,114.71 | 134 | 1,480.55 | 144 |
| South Pike | * 1,858.62 | 94 | 1,265.60 | 67 | 1,707.35 | 98 |
| McComb | 1,941.21 | 68 | 1,223.67 | 84 | 1,858.82 | 56 |
| *Pontotoc* | 1,775.64 | 113 | 1,134.82 | 131 | 1,630.30 | 118 |
| *Pontotoc Sep.* | 1,643.80 | 137 | 1,064.43 | 146 | 1,461.72 | 147 |
| *Prentiss* | 1,884.35 | 86 | 1,316.58 | 43 | 1,756.40 | 84 |
| *Baldwyn* | 1,859.39 | 93 | 1,206.28 | 92 | 1,783.64 | 78 |
| *Booneville* | 1,887.23 | 84 | 1,282.05 | 55 | 1,792.72 | 74 |
| *Quitman* | 1,988.47 | 55 | 1,335.45 | 41 | 1,893.71 | 48 |
| Rankin | 1,556.15 | 150 | 1,043.08 | 148 | 1,427.91 | 151 |
| Pearl | 1,711.80 | 126 | 1,151.38 | 126 | 1,594.58 | 125 |
| Scott | 1,737.36 | 122 | 1,213.54 | 91 | 1,600.68 | 123 |
| Forest | 1,827.34 | 101 | 1,287.52 | 52 | 1,711.70 | 95 |
| Anguilla Line | * 2,018.96 | 49 | 1,187.61 | 103 | 1,921.95 | 42 |
| Sharkey Issaquena | * 2,016.35 | 50 | 1,246.07 | 77 | 1,841.20 | 61 |
| Simpson | 1,819.91 | 102 | 1,260.84 | 70 | 1,698.56 | 102 |
| Smith | 1,941.22 | 67 | 1,232.87 | 81 | 1,739.71 | 88 |
| Stone | 1,989.77 | 54 | 1,215.14 | 88 | 1,833.56 | 66 |
| Sunflower | 1,978.77 | 58 | 1,283.18 | 54 | 1,840.10 | 63 |
| Drew | 2,039.51 | 43 | 1,385.51 | 28 | 1,933.45 | 41 |
| Indianola | 1,640.99 | 139 | 1,178.18 | 111 | 1,589.70 | 126 |
| E. Tallahatchie | * 1,928.67 | 71 | 1,273.27 | 62 | 1,788.65 | 76 |
| W. Tallahatchie | * 1,847.13 | 96 | 1,269.31 | 65 | 1,707.58 | 97 |
| *Tate* | 1,786.61 | 112 | 1,176.14 | 112 | 1,648.01 | 112 |
| *Senatobia* | 1,743.53 | 120 | 1,189.10 | 102 | 1,671.48 | 107 |

| District | Average Current Expenditure per Pupil in ADA (1984–1985) | | Average Current Expenditure per Pupil for Instruction Cost in ADA (1984–1985) | | Average Current Expenditure per Pupil in ADA Less Transportation (1984–1985) | |
|---|---|---|---|---|---|---|
| | Amount | Rank | Amount | Rank | Amount | Rank |
| *North Tippah* | * *1,829.20* | *100* | *1,175.58* | *113* | *1,671.22* | *108* |
| *South Tippah* | * *1,757.42* | *117* | *1,185.98* | *104* | *1,612.25* | *121* |
| *Tishomingo* | *1,968.02* | *61* | *1,157.67* | *123* | *1,819.53* | *70* |
| Iuka | 1,577.18 | 147 | 1,078.86 | 144 | 1,456.91 | 148 |
| *Tunica* | *1,809.43* | *107* | *1,092.64* | *142* | *1,661.67* | *109* |
| *Union* | *1,658.56* | *135* | *1,104.20* | *138* | *1,527.78* | *138* |
| New Albany | 2,073.07 | 40 | 1,367.04 | 32 | 1,985.33 | 35 |
| Walthall | 1,797.02 | 109 | 1,279.93 | 56 | 1,622.85 | 119 |
| Warren | 1,951.95 | 63 | 1,166.91 | 118 | 1,791.93 | 75 |
| Vicksburg | 2,209.59 | 26 | 1,388.60 | 27 | 2,128.96 | 19 |
| Hollandale | .* 1.898.37 | 81 | 1,313.56 | 44 | 1,778.27 | 80 |
| Leland | * 2,261.80 | 17 | 1,498.17 | 9 | 2,141.71 | 15 |
| Western Line | * 2,243.11 | 21 | 1,472.29 | 14 | 2,123.03 | 20 |
| Greenville | 1,974.31 | 60 | 1,279.45 | 57 | 1,918.06 | 44 |
| Wayne | 1,790.77 | 111 | 1,135.49 | 130 | 1,642.63 | 115 |
| *Webster* | *1,834.83* | *99* | *1,225.69* | *83* | *1,688.89* | *104* |
| Wilkinson | 2,304.75 | 14 | 1,442.19 | 20 | 2,137.07 | 17 |
| Louisville | 1,814.22 | 104 | 1,181.68 | 109 | 1,639.88 | 116 |
| *Coffeeville* | * *2,241.05* | *22* | *1,278.55* | *59* | *2,028.25* | *29* |
| *Water Valley* | * *1,705.38* | *128* | *1,040.79* | *149* | *1,492.57* | *142* |
| Yazoo | 2,845.92 | 3 | 1,490.19 | 12 | 2,333.34 | 8 |
| Holly Bluff | * 2,500.03 | 7 | 1,524.17 | 5 | 2,448.57 | 6 |
| Yazoo City | 2,023.38 | 46 | 1,205.28 | 93 | 2,018.31 | 32 |
| Statewide Average | 1,965.78 | | 1,261.09 | | 1,842.94 | |
| Chickasaw Average | 1,853.52 | | 1,218.82 | | 1,722.82 | |
| Choctaw Average | 1,992.92 | | 1,268.17 | | 1,879.67 | |

\* County Office receipts/expenditures prorated to consolidated districts by ADA.
† All school districts within the Chickasaw Cession are denoted by italic typeface. School districts that are partially within the Chickasaw Cession are also in italic type.

SOURCE: Mississippi State Board of Education, 1986 Annual Report of the State Superintendent of Public Education 144–146 (1986).

## TABLE B
### RECEIPTS FOR PUBLIC SCHOOLS
### 1984–1985

Source of State Funds:

| | | |
|---|---:|---|
| State Dept. of Ed. | $ 9,005,760 | |
| Per Capita & Minimum Program | 490,568,205 | |
| Vocational Ed. | 16,269,064 | |
| Chickasaw | 61,454 | |
| Homestead Exemption | 30,916,541 | |
| EFC Payments | 2,898,692 | |
| Severance Tax | 10,290,972 | |
| Driver Penalty Funds | 555,963 | |
| Textbook | 6,110,596 | |
| School Lunch | 574,624 | |
| Adult Ed. | 35,619 | |
| Educable Children | 511,070 | |
| Ed. Reform Act | 985,796 | |
| Other | 153,766 | |
| Total State Funds | $ 568,938,122 | 56.1% |

Source of Federal Funds:

| | | |
|---|---:|---|
| State Dept. Ed. | $ 6,293,149 | |
| Vocational Ed. | 3,540,422 | |
| National Forest | 3,247,726 | |
| TVA | 643,509 | |
| P. L. 874 | 2,657,490 | |
| ECIA Ch. 1 | 64,896,618 | |
| ECIA Ch. 2 | 4,388,330 | |
| ESEA Other | 107,118 | |
| OEO | 151,860 | |
| Soc. Sec. Tit. XX & CETA (Emp. Sec. Comm.) | 1,677,019 | |
| School Lunch & Sp. Milk & Nonfood Asst. | 67,638,280 | |
| School Lunch, Commodities, Food | 12,660,094 | |
| Adult Ed. | 745,079 | |
| Education Handicapped Act | 11,347,044 | |
| Other (*e.g.*, CETA Governor's Office) | 3,403,978 | |
| Total Federal Funds | $ 183,397,716 | 18.1% |

Source of Local Funds:

| | | |
|---|---:|---:|
| Ad Valorem Tax | $ 165,985,203 | |
| Mineral Lease Tax | 86,276 | |
| Tuition from Patrons | 1,991,041 | |
| Transp. Fees from Patrons | 222,585 | |
| Sixteen Section Income | 16,272,925 | |
| Interest on Investments | 12,800,202 | |
| Intermediate Source | 816,620 | |
| Bond & Int. Fund Receipts | 25,405,580 | |
| School Lunch | 24,668,351 | |
| Student Activity | 7,063,639 | |
| Other | 5,809,634 | |
| Total Local Sources | $ 261,122,056 | 25.8% |
| TOTAL REVENUE RECEIPTS | $1,013,457,894 | 100.0% |
| Nonrevenue Receipts: | | |
| Sale of Bonds | $ 33,393,809 | |
| Sale of Assets | 1,603,699 | |
| Insurance Loss Recovery | 3,383,380 | |
| Loans | 10,357,549 | |
| TOTAL NONREVENUE RECEIPTS | $ 48,738,437 | |
| TOTAL REVENUE & NONREVENUE RECEIPTS | $1,062,196,331 | |

SOURCE: Mississippi State Board of Education, 1986 Annual Report of the State Superintendent of Public Education 48 (1986).